Johns et al., Appellants, *v.* Cheeseman.

Argued September 25, 1972; reargued September 26, 1973. Before JONES, C. J., EAGEN, O'BRIEN, POMEROY, NIX and MANDERINO, JJ.

reargument refused July 12, 1974.

*William D. Sutton,* with him *Lee C. McCandless, Frank P. Krizner, Thorp, Reed & Armstrong,* and *McCandless, Chew & Krizner,* for appellants.

*Saul J. Bernstein,* with him *Willis A. MacDonald,* and *Bernstein and Campbell,* for appellees.

OPINION BY MR. JUSTICE POMEROY, July 1, 1974:

The appellants are stockholders of the Community Finance Company of Butler ("Finance"), a Pennsylvania corporation engaged in the business of making small loans to consumers. They own approximately 30% of the outstanding stock. On March 8, 1971, they filed a complaint in equity, asserting a stockholders' derivative action against the corporation,[1] a number of directors of the corporation, and against the estate of W. Carl Cheeseman, the deceased former chief executive officer of the corporation.[2] Preliminary objections in the nature of a demurrer having been filed and overruled, defendants answered on the merits and, under the heading of "New Matter", pleaded the affirmative

---

[1] The plaintiffs have listed Community Finance Company as a plaintiff. The corporation in a stockholder derivative action is properly a defendant and not a plaintiff. 8A P.L.E. Corporations §151 at 257. See, e.g., *Reifsnyder v. Pittsburgh Outdoor Advertising Co.,* 405 Pa. 142, 173 A.2d 319 (1961).

[2] This action was brought following refusal of the Board of Directors of the corporation of a written demand by plaintiffs that it take appropriate action to obtain the relief sought by this suit. Several of the plaintiffs were also directors of Finance at various times prior to suit.

defenses of laches and estoppel.[3] Plaintiffs filed a reply to the new matter, denying that a factual basis existed upon which they could be said to be either estopped or guilty of laches.

Defendants then moved for judgment on the pleadings under Pa. R. C. P. 1034. Plaintiffs in turn moved for summary judgment, but in that motion stated that "the pleadings of the defendants in this case" entitled them to judgment. The lower court denied the plaintiffs' motion for summary judgment and granted the defendants' motion on the "basis of facts developed by the pleadings and the depositions relevant to the positions of the parties . . ."[4] It is from that decree that the present appeal is taken by the plaintiffs.

The record as it was originally printed in this Court contained no "depositions . . . of the parties", as referred to in the court's opinion, nor did either appellants or appellees make any reference to such depositions. Since, however, they had clearly been considered by the lower court in reaching its decision, we ordered that the parties print a supplemental record containing the depositions referred to and considered by the court below and that the parties file supplemental briefs addressed to the question of what facts were established without genuine dispute by the proceedings below.

---

[3] The defendants by their answer also purported to join as additional defendants under Pa. R. C. P. 2252 those plaintiffs who were also directors of Community Finance Corporation. It is unclear from the record whether this joinder was pursued and accomplished as provided by the Rule. The court below made no mention of the matter, and there is no reason for us to discuss it in this opinion.

[4] There is confusion in this record as between the function and proper use of a motion for judgment on the pleadings, on the one hand, and a motion for summary judgment, on the other. See Pa. R. C. P. 1034, 1035. It appears that the trial court treated defendants' motion as, in effect, a motion for summary judgment.

The salient facts derived from the pleadings and depositions, insofar as they are not in genuine dispute, are as follows. The Community Finance Company ("Finance") is a closely-held corporation which has been since 1932 engaged in the business of making small consumer loans. In 1954, Finance formed a subsidiary, Community Investment Corporation ("Investment"), for the purpose, *inter alia,* of selling insurance. Investment was also used by Finance as its vehicle to own land and to construct a banking building in 1957-1958.

In connection with its small loan business, Finance (or its subsidiaries) offered its borrowers credit health and/or credit life insurance. If the borrower elected the insurance coverage, Finance employees would process the necessary paperwork, would collect the insurance premium (or deduct it from the loan proceeds), and would forward the sums thus obtained to the insurance company offering the insurance through Finance. The insurance company would then return to the "agent" at Finance a commission on the premiums. These commissions lie at the heart of this dispute.

Prior to 1957, the managers (in succession) of Finance's affairs were permitted by the Board of Directors to obtain a license as an insurance agent and to retain as part of their compensation the commissions returned by the insurance company. In 1957, Carl W. Cheeseman, now deceased, became the manager of Finance. The minutes of Finance reflect that on October 21, 1957, Mr. Cheeseman addressed the Board of Directors and reported his activities as follows: "W. C. Cheeseman reported that following examination he had received license as Agent of Credit Life Insurance Company of Springfield, Ohio, and that to date commissions in the amount of $1,014.97, had been paid to him on premium insurance placed on insurance borrowers; *he further stated that while these commissions were*

*usually retained by the Agent, that he wished to have the commissions arising from Community Finance Company and Community Discount Company to go to the Community Investment Corporation to apply on bond interest and other expense, until such time as when rentals and other income would be sufficient to put Community Investment on a sound financial basis;* he further requested authority to deposit the insurance proceeds in the Butler Savings and Trust Company with the signature of any two officers to apply on checks. Such approval was given by unanimous vote." (Emphasis added.) During the period of late 1957 until some date in 1960, Cheeseman, as he indicated he would do, directed the insurance commissions into the accounts of Finance or its subsidiary Investment. Thereafter, however, and without further communication with the Board of Directors of Finance, Cheeseman ceased having the commissions paid to Finance, and retained them for himself.

Between the October, 1957 meeting of the Finance Board of Directors and the date of Carl Cheeseman's death in October, 1968, the subject of insurance commissions was never again discussed at a Finance Board meeting. It was only after Cheeseman's death in 1968 that it was discovered that the insurance commissions had enjoyed an apparently substantial growth, commensurate with the growth of Finance's business.

In January, 1963, Finance executed with Cheeseman an "Employment and Deferred Compensation Contract", under which Finance promised to employ Cheeseman for an additional five years at $800 per month and, upon his death or retirement, to pay $600 per month for sixty months ($36,000) to either Cheeseman, his widow, or his children. That contract also provided that Finance would be released from all obligations in the event of "gross misconduct" on the part of Cheeseman.

The count in the complaint which was directed against the Cheeseman estate seeks recovery of the insurance commissions. The action against the remaining defendants, all of whom were both stockholders and directors of Finance (and some of whom, according to deposition testimony, professed an awareness of Cheeseman's receipt of the commissions throughout), alleges a conspiracy to misuse corporate assets; claims that each director, by refusing the demand to take action against the Cheeseman estate, had become individually liable; alleges negligence in failing to investigate during the lifetime of Cheeseman the disposition of the insurance commissions; and finally charges a failure to take advantage of a corporate opportunity with respect to the commissions.

The court below, in its opinion in support of its decree granting "judgment on the pleadings", stated that "[b]etween the years of 1958 and 1968 there was a lack of due diligence on the part of the directors" and that "[t]he record is devoid of any explanation of why the directors from 1958 to 1968 failed to pursue and determine the issue of 'who is to receive the commissions' ", and thus held that the "inexcusable delay for ten years . . . for which plaintiffs are responsible" constituted laches and barred the plaintiffs' claim. We are unable to agree with this holding at this stage of the case.

It is to be noted at the outset that there is a statute of limitation governing the bringing of actions against stockholders and directors of corporations: "It is hereby declared to be the true intent and meaning of the statutes of limitation, that no suit, at law or in equity, shall be brought or maintained against any stockholder or director in any corporation or association, to charge him with any claim for materials or moneys for which said corporation or association could be sued, or with any neglect of duty as such stockholder or director, except within six years after the delivery of the materials

or merchandise, or the lending to or deposit of money with said corporation or association, or the commission or such act of negligence by such stockholder or director." Act of March 28, 1867, P.L. 48, §1, 12 P.S. §41. The gravamen of the complaint here is neglect of duty of the defendant directors and the estate of the deceased principal director of the corporation, Mr. Cheeseman. Thus, it appears that this six-year statute of limitation is applicable to this case.[5]

It follows that this action, filed March 8, 1971, cannot reach any alleged misconduct which occurred before March 8, 1965, absent a tolling of the statute. The action is timely, however, as to misconduct which may have occurred after that date in March, 1965, unless plaintiffs' conduct constitutes such laches as will cause equity to hold an action barred, notwithstanding that it is not barred by the statute of limitation.[6]

In *Ebbert v. Plymouth Oil Company*, 338 Pa. 272, 13 A.2d 42 (1940), an action similar to the case at bar, we held that the limitation contained in the Act of 1867 was tolled by the affirmative acts of the defendants designed to conceal appropriation of corporate property, and that where such acts prevented the plaintiff from

---

[5] Even had the statute not expressly included actions in equity, this is a situation in which "equity follows the law." See *Elias v. Elias*, 428 Pa. 159, 237 A.2d 215 (1968) ; *Bailey v. Jacobs*, 325 Pa. 187, 189 A. 320 (1937) ; See also *Potter v. Walker*, 276 N.Y. 15, 11 N.E. 2d 335 (1937) ; Comment, Statute of Limitations and Shareholders' Derivative Actions, 56 Colum. L. Rev. 106, 108-09 (1956) ; 2 J. Pomeroy, Equity Jurisprudence 193, §426a (5th ed. Symons, 1941).

[6] A court of equity is not hidebound by the applicable statute of limitation, but may in an appropriate case hold a plaintiff guilty of laches at a point within the running of the legal statute of limitation. See, e.g., *Freeman v. Lawton*, 353 Pa. 613, 617, 46 A.2d 205 (1946) ; *Bangert v. Provident Trust Co.*, 314 Pa. 442, 446, 171 A. 564 (1934) ; *First Nat'l Bank v, Lytle Coal Co.*, 332 Pa. 394, 3 A.2d 350 (1939).

gaining knowledge of the misconduct, laches was not a valid defense to her claim. The burden is on the plaintiffs, however, to plead and prove facts which would serve to toll the running of the statute. *Turtzo v. Boyer,* 370 Pa. 526, 88 A.2d 884 (1952).

Certainly the incident reflected by the corporate minutes of October 21, 1957, does not reveal the affirmative deceit required to toll the statute. At the meeting of the Finance Directors on that date, Mr. Cheeseman gave clear indication to the Board that he regarded the insurance commissions generated by the business of Finance as properly his, and that he intended to pay the commissions to Investment *"until such time* as when rentals and other income would be sufficient to put Community Investment on a sound financial basis". (Emphasis supplied.) This statement, with knowledge of which the plaintiff directors are chargeable, can only be construed as conveying an intention on Cheeseman's part to retain the insurance commissions again at some time in the future. Thus when, in 1960, Cheeseman did in fact begin to retain the commissions, the statute was not tolled; even assuming Cheeseman's conduct in so doing was wrongful, we think any claim returning to this date was barred by lapse of time.

There is, however, a second incident which causes us to reverse the judgment in the defendants' favor. The lower court, in granting summary judgment for all defendants, observed that "[o]ther than as herein stated [*i.e.,* the October 21, 1957, minutes of the Finance directors' meeting] the pleadings and depositions are free from allegations or statements that W. Carl Cheeseman made any representation as to the disposition of the insurance commissions". The complaint, however, alleges that Cheeseman "wrongfully, illegally and *fraudulently* appropriated said commissions", and the record contains a deposition in which the following incident was related. C. A. Billingsley, one of the plaintiff di-

rectors, stated that on one occasion (probably shortly before the execution of the 1963 Employment and Deferred Compensation Contract—the record is not clear on the point), the Board of Directors approached Cheeseman with a proposition to increase his salary, with the result indicated by the following testimony: "Q. Did you have any knowledge of any other director at any of these directors meetings questioning his compensation? A. The only time compensation came up was when we wanted to give him a raise and he wouldn't accept it. Q. At that time didn't the Board have knowledge that the insurance commissions were being paid to Carl Cheeseman? A. No sir. Q. The Company wanted to give him a raise. He didn't accept the raise. Do you know of any reasons why Mr. Cheeseman at that time stated he wouldn't accept a raise? A. I'll give you the reason he stated. Q. Did he make a statement at that time? A. Yes, he did. He made the statement that he didn't want to get more than his manager, so there wouldn't be any jealousy and that he was getting more than them. Do you remember that, Walter?" Because summary judgment can be entered only in clear and doubt-free cases, *Hammermill Paper Co. v. Rust Engineering Co.*, 430 Pa. 365, 243 A.2d 389 (1968); *Gabster v. Mesaros*, 422 Pa. 116, 220 A.2d 639 (1966); *Schaffer v. Larzelere*, 410 Pa. 402, 189 A.2d 267 (1963), we are unable to say that the above incident, if established at trial,[7] would not serve to toll the running of the statute of limitation; it smacks enough of affirmative misrepresentation to prevent our saying as a matter of law that the statute was not tolled. We thus conclude that summary judgment was an inappropriate vehicle for disposing of this litigation as to the estate of W. C. Cheese-

---

[7] Whether this evidence would be admissible at trial may be open to question. *See* Act of May 23, 1887, P.L. 158, §5, cl. (e), 28 P.S. §322.

man. Plaintiffs' claims may not be barred by limitation insofar as they relate to the period after March, 1965, nor may they be so barred at an earlier date if the incident set forth above can be established at trial and if it amounts to the sort of affirmative effort at concealment required to toll the statute.

We also reverse the summary judgment entered below in favor of the remaining defendants, stockholder-directors of Finance. The court below in its opinion addressed only the claim against the estate of Cheeseman and did not discuss the claims against remaining defendants, nor have appellants and appellees done so in this Court. We must decline to resolve the question unaided.

Decree reversed and case remanded for further proceedings consistent with this opinion, the respective parties to bear their own costs.

Mr. Justice NIX and Mr. Justice MANDERINO concur in the result.

Mr. Justice ROBERTS took no part in the consideration or decision of this case.