Abbasi Communications and :
Phoenix Insurance Company, :
              Petitioners :
  :
  :
      v. :
  :
  :
Workers' Compensation Appeal :
Board (Cramer) : No. 487 C.D. 2019
         Respondent : Submitted: August 9, 2019


BEFORE:   HONORABLE PATRICIA A. McCULLOUGH, Judge
              HONORABLE ANNE E. COVEY, Judge
              HONORABLE ELLEN CEISLER, Judge

OPINION NOT REPORTED

MEMORANDUM OPINION BY
JUDGE COVEY                       FILED:  November 18, 2019


        Abbasi Communications (Abbasi) and Phoenix Insurance Company (Phoenix) (collectively, Petitioners) petition this Court for review of the Workers' Compensation (WC) Appeal Board's (Board) March 29, 2019 order affirming the Workers' Compensation Judge's (WCJ) decision granting Thomas Cramer's (Claimant) Claim Petition. Petitioners present two issues for this Court's review: (1) whether the WCJ's finding that Claimant lacked control over his schedule is supported by substantial evidence; and (2) whether the Board erred by affirming the WCJ's legal conclusion that Claimant was Abbasi's employee. After a thorough review, we affirm the Board's order.

        On August 10, 2015, Claimant filed a Claim Petition seeking WC benefits, wherein he alleged that, on May 31, 2015, he sustained "[m]ultiple fractures – Thoracic & Ribs" after falling "6 to 7 feet off [of] a ladder [and] landing onto a

metal fence[,]" while working with Abbasi as a Hughes Network Systems (HughesNet) satellite internet equipment installer. Reproduced Record (R.R.) at 1a. Abbasi filed an answer denying the material averments in the Claim Petition.[1]

At the parties' request, the question of whether Claimant was an independent contractor or an employee when the alleged injury occurred was bifurcated. Claimant testified at hearings on September 21, 2015, November 2, 2015, January 25, 2016, and March 21, 2016. Sinan Abbasi, Abbasi's owner, testified on November 2, 2015. On August 26, 2016, the WCJ issued an interlocutory decision and order (Interlocutory Decision) holding that Claimant had proved he was Abbasi's employee at the time of his injury.[2]

On January 25, 2018, the WCJ issued a final decision and order (Final Decision) granting Claimant's Claim Petition. On February 14, 2018, Petitioners appealed from the Final Decision to the Board, asserting that no employer-employee relationship ever existed between Abbasi and Claimant. On March 29, 2019, the Board affirmed the WCJ's Final Decision without including any relevant independent legal analysis in its opinion. Rather, the Board stated: "[T]he WCJ determined that this matter came down to the legal issue of whether Claimant was an employee . . . or independent contractor. After weighing the evidence against the applicable law, the WCJ reasonably concluded that Claimant was an employee . . . ." Bd. Op. at 11. The Board further explained:

> [T]he WCJ . . . determined that, while **there were elements of both an employment relationship and an independent**

---

[1] Phoenix filed a separate answer, averring that Abbasi had no WC coverage through Phoenix in Pennsylvania. Thereafter, Claimant filed a second claim petition against the Uninsured Employers Guaranty Fund (UEGF). The UEGF filed an answer denying all material allegations. The UEGF also filed a joinder petition against HughesNet. HughesNet and its insurer filed answers denying the material allegations.

[2] In the Interlocutory Decision, the WCJ also concluded that, at that time, the record was not yet complete as to whether HughesNet was Claimant's statutory employer on May 31, 2015.

2

**contractor role**, making this a very difficult decision, the preponderance of the evidence established that [Abbasi] **exercised enough control over Claimant, in the aggregate, to be viewed as his employer** and, thus, liable to Claimant for ongoing temporary total disability benefits. We agree that the record supports the WCJ's determination.

Bd. Op. at 11-12 (emphasis added). Petitioners appealed to this Court.[3]

Initially, "[w]hether an employer-employee relationship exists is a question of law based upon findings of fact."[4] *B & T Trucking v. Workers' Comp. Appeal Bd. (Paull)*, 815 A.2d 1167, 1171 (Pa. Cmwlth. 2003).

Whether one's status is that of an employee or independent contractor 'is a crucial threshold determination that must be made before granting [WC] benefits.' *Universal Am-Can[, Ltd. v. Workers' Comp. Appeal Bd. (Minteer)*, 762 A.2d 328,] 330 [(Pa. 2000)]. This is because independent contractors cannot recover benefits under the [WC] Act[5] ([] Act). The claimant bears the 'burden to establish an employer[-]employee relationship in order to receive benefits.' *Universal Am-Can*, 762 A.2d at 330.

---

[3] "This Court's review is limited to whether there was a violation of constitutional rights or error of law, and whether necessary findings of fact were supported by substantial evidence." *Am. Rd. Lines v. Workers' Comp. Appeal Bd. (Royal)*, 39 A.3d 603, 610 n.6 (Pa. Cmwlth. 2012).

On May 29, 2019, Petitioners filed a supersedeas request with this Court. On July 8, 2019, after argument, this Court denied the supersedeas request because Petitioners failed to demonstrate irreparable injury.

On August 26, 2019, Claimant filed a Motion to Compel Petitioners to make WC benefit payments (Motion to Compel). Therein, Claimant averred that following this Court's denial of Petitioners' supersedeas request, "[Petitioners] ha[ve] not paid [Claimant] and his [a]ttorney, penalties for late payments and his [a]ttorney's percentage of medical bill payments that have been previously paid by Petitioner[s]." Motion to Compel at 1, ¶ 3. In addition, Claimant alleged that "to date the Petitioner[s] ha[ve] failed to make payment to the Department of Veteran's Affairs as directed, subtracting therefrom twenty percent (20%) attorney's fees to be paid to [Claimant's] attorney." *Id*. at 1, ¶ 4. Petitioners did not file a response thereto. Claimant's Motion to Compel is dismissed without prejudice so that Claimant may petition the WCJ for relief.

[4] "Because the determination as to the existence of an employer[-]employee relationship is a question of law, on this issue, our scope of review is plenary and our standard of review is *de novo*." *Dep't of Labor & Indus. v. Workers' Comp. Appeal Bd. (Lin & E. Taste)*, 155 A.3d 103, 109 (Pa. Cmwlth. 2017), *aff'd*, 187 A.3d 914 (Pa. 2018).

[5] Act of June 2, 1915, P.L. 736, *as amended*, 77 P.S. §§ 1-1041.4, 2501-2710.

. . . . There is no bright line rule for determining whether a particular relationship is that of an employer-employee or owner-independent contractor. Nevertheless, our Supreme Court has established the following factors that must be considered when making such determination:

> Control of manner work is to be done; responsibility for result only; terms of agreement between the parties; the nature of the work or occupation; skill required for performance; whether one is engaged in a distinct occupation or business; which party supplied the tools; whether payment is by the time or by the job; whether work is part of the regular business of the employer, and also the right to terminate the employment at any time.

*Id.* at 333 (quotation marks and citations omitted) (*quoting Hammermill Paper Co*[.] *v. Rust Eng*[*'g*] *Co*[.], . . . 243 A.2d 389, 392 ([Pa.] 1968)) [(*Hammermill* Factors)]. 'Whether some or all of these factors exist in any given situation is not controlling.' *Id.* **Although each factor is relevant, 'control over the work to be completed and the manner in which it is to be performed are the primary factors in determining employee status.'** *Id.* 'Moreover, it is the existence of the *right* to control that is significant, irrespective of whether the control is actually exercised.' *Id.* (emphasis in original).

*Dep't of Labor & Indus. v. Workers' Comp. Appeal Bd. (Lin & E. Taste)*, 155 A.3d 103, 109-10 (Pa. Cmwlth. 2017), *aff'd*, 187 A.3d 914 (Pa. 2018) (bold emphasis added; citations omitted). Further,

> [c]ontrol exists where the alleged employer: 'possesses the right to select the employee; the right and power to discharge the employee; the power to direct the manner of performance; and, the power to control the employee.' *Am. Rd. Lines* [*v. Workers' Comp. Appeal Bd. (Royal)*], 39 A.3d [603,] 611 [(Pa. Cmwlth. 2012)] (citing *3D Trucking* [*Co., Inc.*] *v. Workers' Comp. Appeal Bd. (Fine & Anthony Holdings Int'l)*, 921 A.2d 1281 (Pa. Cmwlth. 2007)).

> Moreover, payment of wages and payroll deductions are significant factors, as is provision of [WC] coverage. However, payment is not determinative. In addition, a tax

4

filing denoting self-employment, while a relevant factor, is not dispositive on the issue. Similarly, the existence of an employment or independent contractor agreement is another factor to consider, but it is not, by itself, dispositive.

*Edwards v. Workers' Comp. Appeal Bd. (Epicure Home Care, Inc.)*, 134 A.3d 1156, 1162-63 (Pa. Cmwlth. 2016) (citations omitted).

The WCJ assessed the evidence as follows:

> **I find the testimony of both** . . . **Claimant and Sinan Abbasi to be credible.** Although they, of course, disagree on the legal question of whether Claimant is an independent contractor or employee of Abbasi . . . , remarkably **their testimony is in agreement on almost every material fact.** They agree that: (1) Claimant was recruited via a posting on the internet concerning a satellite internet installer opportunity; (2) Claimant was given business cards and a plaque for his truck, both of which had Abbasi's business phone number listed, and not Claimant's phone number; (3) Claimant was given installation assignments through Abbasi's website, which he could not change without Abbasi's approval; (4) Claimant was required to remain certified by HughesNet and received periodic guidance on how installations were to be performed, which included sending Abbasi a photo of the completed installation to ensure compliance; (5) Claimant was not paid by the hour or day but by completed installation; (6) Claimant owned his own vehicle and tools, but had inventory responsibilities at a storage site paid for by Abbasi; [and] (7) Claimant's tax documents were completed in such a manner as to treat his income from Abbasi as self-employment income, and not wages.

Interlocutory Decision at 8 (emphasis added). Based on the evidence adduced at the hearings, the WCJ reasoned that three *Hammermill* Factors supported that Claimant was an independent contractor:

> He supplied his own tools, supplies and vehicle for installation jobs assigned to him by Abbasi. Claimant was paid by completed job, and not by the amount of time he worked. The forms completed by Claimant at the beginning of his relationship with Abbasi, and the tax forms

5

completed each year he accepted assignments from [Abbasi], suggest that he considered himself to be an independent contractor.

Interlocutory Decision at 9. The WCJ then considered *Hammermill* Factors tending to support an employer-employee relationship between Claimant and Abbasi:

> **Claimant had no control over his installation assignments, which were made exclusively by Abbasi. Even the slightest scheduling change was subject to approval by Abbasi. Claimant did not control the manner of the work to be done. He had to adhere to HughesNet guidelines, and did not get paid until he submitted a photo of the HughesNet equipment installed to the satisfaction of Abbasi and/or HughesNet, regardless of whether the customer was satisfied.** Claimant was not engaged in an occupation or business distinct from that of Abbasi or HughesNet. The phone number on Claimant's truck and business card belonged to Abbasi, and Claimant had no access to the e[]mail account on his business card, which was designed and paid for by Abbasi. Claimant's work was part of the regular business of both Abbasi and HughesNet; it could be said that neither Abbasi [n]or HughesNet could remain in business without the type of installation work performed by Claimant and other installers.
>
> **Abbasi retained the right to control the work to be done by Claimant and the manner in which it was to be done.** In fact, Abbasi exercised that right. **It was Abbasi, not Claimant, [that] was in complete control of Claimant's installation assignments. Changes in those assignments had to be approved by Abbasi.** This demonstrates that Abbasi had the right to control the work to be done by Claimant. **Likewise, Abbasi and/or HughesNet controlled the manner in which Claimant's work was done. Claimant could not get paid for his installation work without submitting a photo to Abbasi, showing that the installation had been done in accordance with the specifications of Abbasi and/or HughesNet.**

Interlocutory Decision at 9-10 (emphasis added). Weighing these facts, the WCJ concluded that Claimant was Abbasi's employee at the time Claimant was injured.

This Court first addresses Petitioners' argument that the WCJ's finding that Claimant lacked control over his schedule is not supported by substantial evidence. The WCJ found that:

> Claimant received work assignments through Abbasi's website. The website would tell him how many jobs he had that day, what kind of jobs they were, and the time slot to accomplish them. Claimant did not schedule installations on his own; this function was performed by Abbasi. Any changes to [Claimant's] work schedule had to be approved by Abbasi.

Interlocutory Decision at 4, ¶ 5(e).

Petitioners dispute the WCJ's "purported notion that . . . Claimant was told when and where to work and that he had to first seek Abbasi's approval to rearrange his schedule." Petitioners' Br. at 29. Petitioners claim that the record evidence does not support such a conclusion, and instead demonstrates that Claimant maintained control over his appointment times and locations, which is indicative of an independent contractor relationship.

Petitioners stress, and Claimant acknowledged, that prior to beginning his work for Abbasi, Abbasi requested Claimant to complete a "Contractor Technician Coverage" form (Form), wherein Claimant identified mileage limitations for his service area and described his availability. R.R. at 313a. Notably, the Form included instructions stating:

> In an event where [a] route must be different than the coverage listed [in the Form,] dispatch will call you to accept or reject [the] route. If you can[]not be reached by phone, you will receive a voice mail message and an email. From that point **you have 1-hour to contact dispatch but if you fail to do so, you are *required* to run that route.**

7

*Id*. (Bold and italic emphasis added). It also contained an acknowledgment above Claimant's signature that "any false statements made herein will void my Application for **Employment** and any actions based on it." *Id.* (Emphasis added.) Claimant noted with respect to the Form:

> [A]s far as I was concerned, it set down the parameters of the work that I was to do for [Abbasi], as far as counties covered and distances I traveled in between, so I would know ahead of time what [Abbasi] expected of me. And it was a mutual thing. In other words, I --- I signed it because it was satisfactory to what I wanted to do.

R.R. at 46a.

Petitioners also reference Sinan Abbasi's testimony that Claimant could decline assignments, *see* R.R. at 96a, and, if Claimant wished not to work at all in a given week, he was free do so. *See* R.R. at 132a. Further, Petitioners contend Claimant could reschedule an appointment directly with a client, but acknowledged there was an expectation that Claimant notify Abbasi so its schedule could be updated. *See* R.R. at 98a.

Claimant testified that "work was scheduled and set up by Sinan Abbasi. And it would appear on the A-connect website[6] as far as where it was located; contact information; when [he] was to perform, morning or afternoon, the work." R.R. at 215a. Claimant explained that he was required to get Abbasi's permission to change his schedule, however, he later clarified that there were instances where he contacted customers to change appointment times, but did so to determine customers' availability, informed the customers that the change must be approved by Abbasi and, thereafter, sought Abbasi's approval.[7] Sinan Abbasi admitted that the A-connect

---

[6] "A-connect was a website set up through [Abbasi] primarily to assign work . . . on a daily basis, morning and afternoon." R.R. at 215a.

[7] Claimant acknowledged on cross-examination that he informed Abbasi in a June 23, 2012 email that he had personal items to attend and accordingly, requested Abbasi to move Claimant's morning appointment and block off the afternoon. The email reflects that Claimant did so

website "wasn't designed . . . that [Claimant could] just reject a job or accept a job." R.R. at 96a.

"As the sole fact-finder in [WC] cases, the WCJ has exclusive province over issues of credibility and evidentiary weight." *Bristol Borough v. Workers' Comp. Appeal Bd. (Burnett)*, 206 A.3d 585, 611 (Pa. Cmwlth. 2019). Based on the aforementioned testimony, this Court agrees that substantial evidence supports the WCJ's finding that "Claimant did not schedule installations on his own; this function was performed by Abbasi [and that a]ny changes to [Claimant's] work schedule had to be approved by Abbasi." Interlocutory Decision at 4, ¶ 5(e).

This Court next addresses Petitioners' contention that the WCJ and the Board erred by concluding that Claimant was Abbasi's employee at the time he was injured on May 31, 2015. Petitioners argue that, although the WCJ properly determined that three of the *Hammermill* Factors supported the conclusion that Claimant was an independent contractor, the WCJ erred when he concluded that Abbasi controlled Claimant's work and thus was Claimant's employer based on the following findings: (1) Abbasi controlled the manner of Claimant's work; (2) Abbasi controlled where and when Claimant worked; and (3) Abbasi issued Claimant business cards and a magnetic van placard displaying Abbasi's name.

Petitioners assert that Abbasi did not direct the manner of Claimant's work, and that Abbasi's requirement that Claimant adhere to HughesNet installation specifications and submit a completed installation photograph to Abbasi does not amount to control over Claimant's work performance. In support, Petitioners cite *Cox v. Caeti*, 279 A.2d 756 (Pa. 1971), *Lin*, and *Holt v. Unemployment Compensation Board of Review*, 840 A.2d 1071 (Pa. Cmwlth. 2004), for the proposition that

---

requesting to take his daughter for a medical appointment. *See* R.R. at 185a-187a, 354a. In another email, Claimant requested Abbasi schedule one additional appointment the following Monday because he needed to get home early that day. *See* R.R. at 355a. These limited circumstances do not demonstrate that Claimant exercised control over his schedule.

periodic monitoring and inspections for the purpose of controlling the work result does not amount to control over the manner in which the work is performed.

In *Cox*, a negligence action, the Pennsylvania Supreme Court held that an individual who conducted his own business but was engaged by a home improvement company to perform a specialized stonework installation was an independent contractor and not the home improvement company's employee. Rejecting the plaintiff's argument that the home improvement company's ongoing inspection of the stoneworker's progress rendered him a home improvement company employee, the Court explained: "Our Court has previously held that inspection of the progress of the work does not necessarily require an inference of exclusive control over the manner of performance of the work, but rather only of interest in the result." *Cox*, 279 A.2d at 758.

The *Lin* Court considered whether a claimant who was injured while doing remodeling work for a restaurant that had not yet opened for business was the restaurant's employee. Therein, the restaurant owner's husband "told [the c]laimant 'what he wanted done' and [the c]laimant's job 'was to do it.'" *Lin*, 155 A.3d at 110. This Court noted:

> The WCJ explained '[t]his is essentially the same relationship that property owners typically have with painters, plumbers, electricians, carpenters and other remodelers. These specialists bring their time and expertise.' ([Lin] WCJ's op. at 4.) The reasonable inference from the evidence is that [the owner's husband] was in charge of the overall goals of the project and did not control the manner in which the work was to be completed. **Where one reserves no control over the means of accomplishing a contract but merely reserves control as to the result,** 'the employment is an independent one establishing the relation of contractee and contractor and not that of master and servant.' *Gillingham v. Consol Energy, Inc.*, 51 A.3d 841 (Pa. Super. 2012).

10

*Lin*, 155 A.3d at 110 (emphasis added).

Petitioners also rely on *Holt*, wherein this Court addressed the employment status of an individual seeking unemployment compensation benefits who had been paid to provide text for a company's website. The *Holt* Court considered that "[the c]laimant determined what hours she would work and how the services would be performed. [The purported employer] gave [the c]laimant an outline of the text needed, however, [the c]laimant independently determined how to meet those needs. [The c]laimant provided [the purported employer] with a finished text for its use." *Holt*, 840 A.2d at 1072. Noting that "[the c]laimant controlled the manner in which the work was done and had responsibility for the result only[,]" this Court agreed with the Unemployment Compensation Board of Review's determination that the claimant was self-employed. *Id.* at 1073. In the instant matter, Petitioners contend that, as in *Cox*, *Lin* and *Holt*, Claimant was responsible for the result only.

Claimant testified:

A. **There was [sic] training courses through HughesNet themselves** [sic] **to be certified. And it was spelled out there, exactly the steps you had to take and what order. In addition, once I started working for Abbasi, there was [sic] upgrades to the system.** Every couple of years, they'd [sic] come out with a new generation modem. **And I'd have to train through Abbasi/HughesNet courses to be certified for the latest modem installation upgrade.**

Q. Then the method that you performed your work was described to you by Abbasi and by HughesNet?

A. Yeah. And occasionally, [Sinan] **Abbasi . . . would send out an email to all of the techs that worked for him, including me with any areas of concern that might come up. He spelled them out.** If he was getting some feedback from HughesNet or the customers for stuff that shouldn't have been done in that manner, he would send out a bulletin

11

and an email[] blast to all of his techs, **explaining exactly how he thought it should be done.**[8]

Q. How, if at all, did either Abbasi or HughesNet control you when you were at the site to make sure you were performing as they wanted you to?

A. **Well one of the requirements was, as we were installing, we needed to take photos of our work, where we grounded it, where we mounted the dish, line the sight shot up, the arm of dish, so we could see there's no obstructions, all of that. Then we had to submit that to --- I submitted them to Abbasi and I'm assuming [it] submitted them to HughesNet after that.**

Q. Now you would have to do this when you were onsite actually performing the work?

A. Yes, **every single job.**

R.R. at 50a-51a (emphasis added).

Sinan Abbasi explained the reasons for Abbasi's photograph requirement:

> It was HughesNet and [its] distributor. To be able to release the payment to [Abbasi] to pay [Claimant], we needed to show his work or they wanted to see where he installed the equipment, the line of sight or the good stuff. So it was a requirement by HughesNet and [its] distributor to take these photos and upload them through the app that they provided, which [Claimant] will [sic] take a photo of the work he did and it'll automatically upload to the HughesNet servers and

---

[8] Claimant described one such email as follows:

> One of them was how you deal with a customer, as far as your appearance. Encourage us to use booties when we went into a customer's house so that we wouldn't be tracking up the rugs or anything. To clean up all debris that might've been left over, empty boxes and stuff and take them with you. Don't leave them with the customer. And your attitude you should have with being professional, you know, that kind of thing.

R.R. at 67a.

12

[it] look[s] at it. I had the ability to look at it as well, but these photos were a requirement through HughesNet that went directly to [it].

R.R. at 111a-112a. Sinan Abbasi elaborated:

Q. Were there ever any instances . . . where [Claimant] would be doing an installation and would send you photos and you would instruct him to change the location of an installation?

. . . .

A. What we did was, we'd talk about how the installation happened or what he did, **advising that some things need to be done a certain way up to HughesNet's requirement.** If it was a hundred percent just against what they [sic] looked for, he'll have to go back and fix it because there will be no payment coming from HughesNet if the job was not done up to their [sic] standard. Does that make sense?

Q. Yes. And you said their [sic] standards. Were these Abbasi's or HughesNet's?

A. HughesNet and that he had to --- he knew what they [sic] are through training.

Q. And just so I'm clear, you testified on [d]irect [e]xamination about the photos needing to be approved. Was that HughesNet that needed to approve them?

A. Correct. I would look at the photos a day or two after [Claimant] submits them to just see if there's any issues I see so we can resolve whatever it is before it gets to HughesNet and they quality check the job. If it gets to that point, then what they [sic] do is they [sic] create another work order for him to go out and fix it and there's just more headache having it done that way rather than if we catch what it is and it can be resolved before it even gets to the point where they [sic] actually call up and check the order.

R.R. at 133a-135a (emphasis added).

Unlike the purported employers in *Cox*, *Lin* and *Holt*, in accordance with HughesNet's specific requirements, Abbasi did not simply examine the finished

13

work, it insisted that Claimant adhere to HughesNet's detailed installation procedures and submit photographs documenting compliance therewith. Accordingly, Abbasi "reserve[d] . . . control **over the means** of accomplishing [the] contract[,] [and did not] merely reserve[] control as to the result[.]" *Lin*, 155 A.3d at 110 (emphasis added). The record evidence reveals that Claimant learned how to perform installations consistent with HughesNet specifications through HughesNet certification classes. Claimant testified that he received his initial HughesNet certification before he began working for Abbasi, but he continued, as required, to take HughesNet online certification courses thereafter. *See* R.R. at 66a. Claimant agreed that he performed his work at the job sites "based on the training that [he] was required to have." *Id.* at 224a. Thus, it is clear that Abbasi exercised substantial control over the manner in which Claimant performed his work.

With respect to control over Claimant's schedule, this Court concluded, *supra*, that substantial evidence supports the WCJ's finding that Claimant lacked control over his schedule, and that Abbasi exercised such control.

Regarding the business cards and magnetic placard Abbasi provided Claimant for Claimant's van, the WCJ summarized Claimant's testimony:

> b. Claimant explained that Abbasi had business cards printed with Claimant's name on them. The business card in question identified Abbasi . . . , a HughesNet Authorized Retailer, and Claimant as an 'Internet Expert.' (Claimant's Exhibit # 1). The telephone number listed is not Claimant's phone number, but rather, is the toll-free number for Abbasi. The [business] card also contains an e[]mail address . . . which Claimant identified as an address that customers could use to contact Abbasi.

> c. Claimant was instructed by Abbasi to put a magnetic plaque on his vehicle while installing equipment. The plaque contained a HughesNet logo, and Abbasi's toll free telephone number.

> . . . .

14

m. Claimant was encouraged to hand out his business cards from Abbasi, and that he would be paid a commission of $50.00 per sale if he was able to generate new business for Abbasi.

Interlocutory Decision at 4-5 (citations omitted). The WCJ also described Sinan Abbasi's testimony:

f. [Sinan] Abbasi explained that Claimant's truck and business cards set forth the contact information for Abbasi . . . , rather than Claimant's own contact information, because he received complaints from customers that they want something to identify the installers that are coming to their house to do the job. If a customer had any issues with an installer, they were to contact [Sinan] Abbasi and let him know. [Sinan] Abbasi admitted that the installers' work trucks were identified in this manner because customers 'can't identify who (the installers) work for.' [R.R. at 103a]. [Sinan] Abbasi agreed that nowhere on the truck plaque or the business cards does his company identify Claimant as an independent contractor; Claimant is instead identified as a 'certified installer.' [R.R. at 116a].

g. [Sinan] Abbasi claimed that [Abbasi's] phone number, rather than Claimant's personal cell phone, was listed on Claimant's business cards 'for his privacy.' [R.R. at 104a.]

h. [Sinan] Abbasi ordered and sent Claimant 250 business cards at Abbasi's expense, in order to increase sales. The cards listed Abbasi's telephone number, and an e[]mail address owned by Abbasi that Claimant could not access.

Interlocutory Decision at 7 (citations omitted).

Based on these facts, the WCJ concluded:

[Sinan Abbasi] could have identified Claimant as an independent contractor on his business cards or truck plaque, but instead, caused confusion by identifying Claimant as an 'Internet Expert' and listing a phone number and e[]mail directed to Abbasi . . . and not to Claimant. Abbasi held Claimant out to the public as one of his own, because as he explained, customers could not determine on their own who the installers worked for. Abbasi wanted the best of both worlds, complete control over the installation

15

process and communication with customers in Pennsylvania, without the cost or added complication of hiring Pennsylvania employees to serve those customers.

Interlocutory Decision at 10.

Petitioners assert that Claimant's use of Abbasi's magnetic plaque is irrelevant to the instant determination and that *Universal Am-Can* supports their position. They claim that the *Universal Am-Can* Court "dismissed [the claimant's] argument" that "the presence of the alleged-[e]mployer's insignia on the outside of [the] vehicle supported the legal determination that the [c]laimant was an employee." Petitioners' Br. at 37. Rather, in *Universal Am-Can*, the Pennsylvania Supreme Court rejected the claimant's contention that an insignia on a vehicle creates an **irrebuttable presumption** of employment status and explained: "The presence of a carrier's insignia on the outside of a rig is merely **one of the many factors** to be considered when determining employee/independent contractor status and does not command a conclusion of employee status."[9] *Universal Am-Can*, 762 A.2d 328, 332 (Pa. 2000) (emphasis added). Like a vehicle insignia, business cards are "one of the many factors to be considered . . . ."[10] *Id*. In the instant matter, the WCJ properly considered Abbasi's directive that Claimant use the metallic plaque and his request that Claimant use the business cards as factors in his analysis and determined that Abbasi held Claimant out to the public to be its employee by doing so. *Id*.

Given Abbasi's extensive control over the manner of Claimant's work and over Claimant's schedule, that Abbasi held Claimant out as his employee, and

---

[9] This Court has explained that "the presence of a party's name . . . on a commercial vehicle raises a rebuttable presumption that the vehicle is owned by that party and that the driver of the vehicle is an employe[e] of that party acting within the scope of his employment." *Workmen's Comp. Appeal Bd. v. Navajo Freight Lines, Inc.*, 338 A.2d 766, 769 (Pa. Cmwlth. 1975).

[10] *See, e.g.*, *Stillman v. Workmen's Comp. Appeal Bd. (CBR Enterprises)*, 569 A.2d 983 (Pa. Cmwlth. 1990); *see also Danielle Viktor, Ltd. v. Dep't of Labor & Indus., Bureau of Emp'r Tax Operations*, 892 A.2d 781 (Pa. 2006); *Hartman v. Unemployment Comp. Bd. of Review*, 39 A.3d 507 (Pa. Cmwlth. 2012).

given the WCJ's thoughtful analysis of the other *Hammermill* Factors indicating an employment relationship, the Board properly affirmed the WCJ's decision.[11]

For all of the above reasons, the Board's order is affirmed.

_____
ANNE E. COVEY, Judge

---

[11] Petitioners also argue that the Board and the WCJ were required to consider **all** *Hammermill* Factors but failed to address the following: (1) whether any special skill was required for Claimant's work; (2) whether Claimant was responsible for the result of his work only; and (3) whether either party held the right to terminate the relationship. Petitioners contend that consideration of those factors would have supported the legal conclusion that Claimant was an independent contractor. This Court has previously rejected a claimant's assertion that the Board's decision should be reversed because "the WCJ did not consider all of the *Hammermill* [F]actors." *Carbaugh v. Workers' Comp. Appeal Bd. (Knight's Home Improvements)* (Pa. Cmwlth., No. 1915 C.D. 2009, filed April 13, 2010), slip op. at 4. The Court explained:

> all of the *Hammermill* [F]actors need not be present, and the key factor is the right to control. The WCJ and the Board specifically found that [the purported employer] did not have a right to control, and that there was no actual supervision exercised by [the purported employer]. Notwithstanding, that finding does not establish that all of the factors were not considered. The WCJ discussed at length the factors used to make his determination and addressed most of the *Hammermill* [F]actors.

*Carbaugh*, slip op. at 4. This Court's unreported memorandum opinions may be cited "for [their] persuasive value, but not as a binding precedent." Section 414(a) of the Commonwealth Court's Internal Operating Procedures, 210 Pa. Code § 69.414(a). Here, given the WCJ's exhaustive analysis, we find *Carbaugh* persuasive and reject Petitioners' argument.

Further, Petitioners contend that the WCJ and Board erred "because the majority of [the *Hammermill*] Factors support a finding that [Claimant] was an independent contractor and not [Abbasi's employee]." Petitioners' Br. at 41. Whether a **majority** of *Hammermill* Factors support a particular finding is not determinative. Rather, "there are certain guidelines that have been elevated to be dominant considerations. . . . [C]ontrol over the work to be completed and the manner in which it is to be performed are the primary factors in determining employee status." *Universal Am-Can*, 762 A.2d at 333. Here, Abbasi exercised significant control over the work, and the manner in which it was to be performed. The extent of the control exercised by Abbasi over Claimant, along with the other factors discussed by the WCJ, supports the conclusion that Abbasi was Claimant's employer.

17

Abbasi Communications and
Phoenix Insurance Company,
              Petitioners

          v.

Workers' Compensation Appeal
Board (Cramer)
              Respondent

No. 487 C.D. 2019

## O R D E R

AND NOW, this 18th day of November, 2019, the Workers' Compensation Appeal Board's (Board) March 29, 2019 order is affirmed.

Thomas Cramer's (Claimant) Motion to Compel is dismissed without prejudice, so that Claimant may petition the Workers' Compensation Judge for relief.

_____
ANNE E. COVEY, Judge