631 A.2d 693

Stephen JOHNSON, Petitioner,

v.

WORKMEN'S COMPENSATION APPEAL BOARD
(DUBOIS COURIER EXPRESS, and PMA
Insurance Company), Respondents.

Commonwealth Court of Pennsylvania.

Argued Oct. 21, 1992.

Decided Aug. 23, 1993.

---

78

Thomas F. Morgan, for petitioner.

James C. Munro, II, for respondent, DuBois Courier Exp.

Before CRAIG, President Judge, and DOYLE, COLINS, McGINLEY, SMITH, PELLEGRINI and FRIEDMAN, JJ.

PELLEGRINI, Judge.

Stephen Johnson (Claimant) appeals from an order of the Workmen's Compensation Appeal Board (Board) affirming the Referee's decision denying him workmen's compensation benefits because he was not an employee of the Dubois Courier Express (Courier/Newspaper) at the time he was injured.[1]

On January 2, 1986, Claimant took over his sister's newspaper delivery route and began delivering newspapers for the Courier. At that time, he was thirteen years old. On the evening of June 6, 1986, while making deliveries, Claimant was

1. This case was reassigned to the author on May 11, 1993.

hit by a car as he attempted to cross the street. He sustained serious injuries and incurred significant medical expenses.

Claimant filed a claim petition for workmen's compensation benefits. The Courier filed an answer denying responsibility and claiming that Claimant was an independent contractor rather than an employee of the Courier at the time of his injury. As such, it claimed his injury was not covered under The Pennsylvania Workmen's Compensation Act (Act).[2]

At the hearing before the Referee, the parties agreed to bifurcate the case so that it could first be determined whether Claimant was an employee of the Courier at the time he was injured. After hearing testimony from both parties, the Referee made the following pertinent findings of fact:

5. At the time of taking over the paper route, the claimant reported to the Defendant's Promotion Director and was, basically, interviewed and instructed in the duties and responsibilities that were expected of him by the Defendant, as well as by the customers being served. Each paper boy is assigned a certain area, or route, within which he delivers newspapers to customers.

6. There was no written contract or agreement between the Defendant and any paper boy.

9. The Defendant supplies and delivers newspapers to a designated drop point selected by the carrier. In this case, the claimant's newspapers were delivered, along with newspapers for other carriers in the city, to Urban's Gas Station. The newspapers were picked up by the claimant and the paper boys, and they then proceeded to deliver the newspapers.

10. The Defendant supplied the bag in which the newspapers were carried, but there was no uniform, or dress code for any paper boy.

11. Newspapers were delivered six (6) days per week, and the carrier paid 5 cents for each newspaper delivered, on a daily basis. Carriers were paid by check mailed to them every two weeks.

2. Act of June 2, 1915, P.L. 736, *as amended*, 77 P.S. §§ 1–1031.

12. Customers paid the Defendant directly for the newspapers; and the carrier did not handle any money. The carrier, or news boy, did not have the right to increase or decrease the price of the newspaper.

13. The Defendant paid the carrier an extra $1.00 every two (2) weeks for good service, and 50 cents was deducted for any customer that was "missed", with no delivery.

14. The Defendant delivered newspapers to the drop point at approximately 2:45 p.m.; and the paper boy was expected to deliver the newspaper to the customer no later than 6:00 p.m.

15. The paper boy determined the manner in which he delivered the newspaper; by foot, bicycle, or other vehicle. The paper boy was not reimbursed for any expense of equipment or materials used in delivery.

16. The claimant determined his own route of travel; and controlled the means of accomplishing the delivery of the newspaper.

17. Very little skill or instruction was required to deliver the newspapers in question.

18. The claimant would deal directly with the customer to obtain instructions as to where to leave the newspaper at the customer's home or place of business.

19. The Defendant exercised no day to day supervision over the claimant, or any other paper boy.

20. The Defendant did not fix the claimant's working hours, other than the newspapers were expected to be delivered prior to 6:00 p.m. so that the customers received "news, not history".

21. The claimant, himself, determined when or at what hour he would deliver the newspapers, within the recommended time frame of 2:45 p.m. to 6:00 p.m., so as to maintain customer satisfaction.

22. The claimant was free to substitute another person to deliver the newspapers without notice or prior approval by the Defendant.

23. The Defendant did not direct the manner and way that the claimant carried out the delivery of the newspapers in question.

24. The claimant and other paper boys were permitted and encouraged to solicit customers within their area, so as to increase their earnings.

25. If a customer requested the Defendant to deliver a newspaper to his home, and that home was located within the claimant's delivery area, the Defendant would notify the claimant of the new customer; and the claimant would handle the delivery of that newspaper.

26. The Defendant did not withhold any taxes or other charges from the claimant's pay; and the claimant was not treated as one of the Defendant's regular employees, as far as benefits, etc., were concerned.

27. The newspaper masthead contained a notice that if any customer had a service problem, to call the Circulation Department; and any complaints on delivery or service were made by the customer directly to the Defendant.

28. In the event of customer dissatisfaction, or other cause shown, the Defendant had the right to dismiss or fire the claimant or any other paper boy, if that paper boy did not remedy the situation that prompted the complaint.

Based on these findings, the Referee found that the Courier did not have any right to control Claimant's performance of his duties and did not exercise any control over the manner in which he performed those duties. As such, Claimant had failed to meet his burden of proving by credible evidence that he was an employee of the Courier at the time he was injured. Claimant filed an appeal with the Board, arguing that the evidence demonstrated that he was an employee of the Courier at the time he was injured, not self-employed. The Board affirmed the Referee's decision and this appeal followed.[3]

3. Our scope of review is limited to determining whether constitutional rights have been violated, an error of law committed, or whether necessary findings of fact are supported by substantial evidence. *Blue Bell Printing v. Workmen's Compensation Appeal Board (Montgomery*

 The sole issue before us is whether Claimant was an employee of the Courier or an independent contractor at the time he was injured for purposes of collecting workmen's compensation benefits. Initially, we note that in order to qualify for workmen's compensation benefits, a claimant has the burden of establishing that an employment relationship existed at the time of the injury and that the injury was related to the employment.[4] *Siano v. Workmen's Compensation Appeal Board (Dileo's Restaurant, Inc.),* 137 Pa.Commonwealth Ct. 487, 586 A.2d 1008 (1991). Whether a claimant is an independent contractor or an employee is a question of law fully reviewable by this court. *Lynch v. Workmen's Compensation Appeal Board (Connellsville Area School District),* 123 Pa.Commonwealth Ct. 299, 554 A.2d 159 (1989), *petition for allowance of appeal denied,* 525 Pa. 629, 578 A.2d 416 (1990).

 In *Hammermill Paper Company v. Rust Engineering Co.,* 430 Pa. 365, 370, 243 A.2d 389, 392 (1968), our Supreme Court set forth the following factors to consider when determining the type of relationship which exists:

· control of the manner in which work is to be done;

· responsibility for result only;

· terms of agreement between the parties;

· the nature of the work or occupation;

· skill required for performance;

· whether one employed is engaged in a distinct occupation or business;

· which party supplies the tools;

· whether payment is by the time or by the job;

· whether work is part of the regular business of the alleged employer, and

*Publishing Company),* 115 Pa.Commonwealth Ct. 203, 539 A.2d 933 (1988).

4. Pursuant to Section 104 of the Act, 77 P.S. § 22, an employee is defined as a person who performs services for another for a valuable consideration, exclusive of those whose employment is casual in character and not in the regular course of the business of the employer.

·whether the alleged employer has the right to terminate the employment at any time.

Because each case is fact specific, all of these factors need not be present to determine the type of relationship which exists. *J. Miller Co. v. Mixter,* 2 Pa.Commonwealth Ct. 229, 277 A.2d 867 (1971).

■ While all of these factors are important indicators, the key element is whether the alleged employer has the *right* to control the work to be done and the manner in which·it was performed. *North Penn Transfer, Inc. v. Workmen's Compensation Appeal Board (Michalovicz),* 61 Pa.Commonwealth Ct. 469, 434 A.2d 228 (1981). If the alleged employer has this right, an employer-employee relationship likely exists. *Douglas v. Workmen's Compensation Appeal Board (Dennis Truck Company),* 40 Pa.Commonwealth Ct. 101, 396 A.2d 882 (1979).

■ In this case, Claimant contends that the Courier exercised such control over his work so as to make him an employee of that newspaper. He points out that the Courier delineated his territory, supplied the names and location of the customers, and controlled the time by which the papers had to be delivered. Specifically, the papers were placed at the pick-up point at 2:45 p.m., he did not get out of school until 3:00 p.m., and the papers had to be delivered by 6:00 p.m. As such, he had a limited time to deliver the approximately 50 papers that he delivered. Further, because the Courier could terminate him at any time, it controlled his employment status and made him an employee at will.

As to other important factors indicating an employer-employee relationship, Claimant advises us that the newspapers and his delivery bag, the only equipment required for the job—were supplied by the newspaper, not him. If he were an independent contractor, he would have been required to purchase the papers for resale and supply his own bag. Additionally, payments from customers were made directly to the Courier, thereby taking away from him any responsibility for collecting and turning in the payments of the papers. Further, he was paid by the Courier every two weeks rather than

84

on a piecemeal basis, which indicated that he was treated like an employee rather than an independent contractor.[5] Similarly, because the Courier permitted him to purchase accident insurance through its insurance carrier and essentially was being provided a benefit by the Courier, that too was an indication that he was an employee.[6]

The Courier responds that it did not control either Claimant's work or the manner of his performance, but only the result. In arguing that Claimant was essentially acting as a delivery service such as UPS or Federal Express, it points out that Claimant was only told to deliver the papers by 6:00 p.m., so that customers received "news" rather than "history," but he was never directed otherwise as to the time or mode of delivery or the route travelled. More specifically, he was not told when he should begin delivering papers, or if he should walk, ride a bicycle, or use a vehicle to deliver his papers. He also was not reimbursed for the expense of any equipment he chose to use in delivering the papers. Additionally, he was not told by the Courier where to place the papers, but instead dealt directly with the customers who gave him instructions if the paper should be left at their home or office.

Claimant also determined the drop-off point of the newspapers and the Courier had no further intervention regarding the delivery of the papers after that point. Importantly, his work was never supervised and he was never required to come

5. Claimant also notes that the Courier would pay him a $1.00 bonus every two weeks for good service, but would deduct .50 cents each time he failed to deliver a paper to a customer.

6. The Circulation Manager for the Courier testified as follows regarding Claimant's accident insurance:

Q. What's this insurance that you're talking about? Does he have the option, or is this a fringe benefit available to all carriers?
A. He had the option to buy it; it was taken out of his check; he had to pay so much each month of it outright.
Q. Well, was it life insurance; accident insurance?
A. It was accident insurance.
Q. Sickness, or just accident?
A. It was accidents that occur upon the route, or actually they were covered on an off the route at that time, but was accident insurance; if broke an arm, leg or whatever.

(Reproduced Record at 86a, 87a.)

down to the Courier to report about his work.[7] Regarding other factors, the Courier explains that because Claimant could solicit new customers without permission from the Newspaper, he was an independent businessman able to increase his revenues by expanding his area of operation. Also, social security payments and taxes were not withheld from Claimant's pay as would be required if he were an employee.[8]

Balancing these factors, we believe that the Courier did not exercise sufficient control over Claimant's work and the manner in which it was performed. As the Referee found, Claimant's work was not controlled in such specific detail that his relationship with the Courier could be called anything but a contract for delivery of service. This becomes even more evident when two additional factors relating to control are considered—that the Courier did not prohibit Claimant from carrying competing newspapers or require Claimant to provide the Courier with notice or get prior approval when he wished to substitute another person to deliver the papers.

The Circulation Manager testified that the Courier's carriers could deliver competing newspapers such as the Clearfield "Progress" and DuBois "Courier" while delivering its newspaper, (Reproduced Record at 75a.), and Claimant's testimony

7. The Courier directs our attention to our holding in *Douglas* where we determined a truck driver was an independent contractor rather than an employee based on similar factors set forth in this case. "It appears that the only indicia of an employment relationship was the fact that the Defendant would have told the Claimant when and where to deliver the materials had he been able to load them on his truck. In all previous assignments of this nature, Claimant was paid by Shempf on a commission basis, he determined his own routes of travel, and he controlled the means of accomplishing the delivery of good." *Id.* 40 Pa.Commonwealth Ct. at 103, 396 A.2d at 883.

8. The Courier also asks us to examine the only two Pennsylvania cases which have addressed the status of a newspaper carrier and have found an independent contractor relationship existed. However, in both *Balinski v. Press Pub. Co. et al.*, 118 Pa.Superior Ct. 89, 179 A. 897 (1935) and *Rodgers v. P–G Publishing Co.*, 194 Pa.Superior Ct. 207, 166 A.2d 544 (1960), the court heavily relied on the fact that the carriers purchased the papers themselves and resold them to customers at a price they set, making a profit on the difference between their purchase and sales price. However, we are not going to rely on either of those cases because this is not a situation involving a sale for resale of newspapers, but rather involves an agreement for delivery service.

supported that this was the Courier's policy.[9] By allowing the carriers to carry competing papers, the Courier was not controlling its carriers' actions because the carriers alone could determine whether they would carry one, two or three different newspapers—thus, determining to whom they would provide a delivery service. As with all delivery services, the company contracting for the delivery service has no control over the carrier and how it performs its work, but only the result which is to have the goods delivered. This situation is no different.[10]

Similarly, regarding the substitution of employees, the Newspaper's Program Director as well as Claimant testified that he was permitted to substitute a person to deliver his papers without giving the Courier notice or receiving prior approval. (Reproduced Record at 56a, 60a, 119a, 121a.) This, too, is an indicator that Claimant was an independent contractor because it shows that the Courier had no control over anyone Claimant chose to replace him on a given day.[11] Claimant argues, though, that this is not an important factor because in this case, the Courier could fine Claimant .50 cents per paper or terminate Claimant if an inadequate substitution was provided and the papers were not delivered. To the

9. Q. Did—was there any restriction against your delivering another newspaper like the "Pittsburgh Post–Gazette" or something like that?
A. Well, we were just assigned the "Courier–Express" right there; they wouldn't let us deliver the "Pittsburgh Press". Well, I could have delivered the "Pittsburgh Press" on Sundays.
Q. You could, or could not?
A. I could, if I wanted to.
(Reproduced Record at 56a, 57a.)

10. Other states which have addressed this identical issue have determined that an independent contractor relationship exists when the carrier is permitted to carry a competitor's newspaper. *See Taylor v. Industrial Accident Commission,* 216 Cal.App.2d 466, 30 Cal.Rptr. 877 (1963) and *Janice v. Hondzinski,* 176 Mich.App. 49, 439 N.W.2d 276 (1989).

11. It is true that when Claimant took over his sister's route, they both went to the newspaper and a Courier employee interviewed him and provided him with instructions regarding his responsibilities. However, we do not believe that this is indicative of an employer-employee relationship. Claimant went to the newspaper offering his delivery service which the newspaper agreed to.

contrary, we believe it shows that the relationship was that of an independent contractor requiring that Claimant get the job done as opposed to an employment relationship.[12]

Employees are generally not empowered with hiring other personnel. If they were, the employer would then have sub-employees which it did not hire, was not aware of, and of which it had no control. Employees also are not empowered to pay other personnel. Because Claimant was permitted to do his own hiring, so to speak, and he paid his substitute rather than the Courier,[13] he was an independent contractor rather than an employee.

Consequently, because the Courier did not control Claimant's work and the manner in which it was performed, Claimant was not an employee of the Courier at the time he was injured. Accordingly, the decision of the Board is affirmed.

## ORDER

AND NOW, this 23rd day of August, 1993, the order of the Workmen's Compensation Appeal Board dated January 28, 1992, No. A91–1992, is affirmed.

FRIEDMAN, Judge, dissenting.

While recognizing that the claimant has the burden to prove his employee status, courts should not hasten to place claimants in the position of independent contractor when a reasonable view of the evidence warrants a finding that the injured person was an employee. *Stevens v. Publishers Agency,* 170 Pa.Superior Ct. 385, 85 A.2d 696 (1952). Although the parties here basically agree on the facts as found by the referee, they differ on the legal conclusions to be drawn from those facts.

12. *See also The Miami Herald Publishing Company v. Kendall,* 88 So.2d 276 (1956), where the Supreme Court of Florida determined that the newspaper carrier was an independent contractor because he was selected and was responsible for his substitute.

13. Claimant testified that on several occasions, a substitute delivered his papers and he paid her directly. (Reproduced Record at 56a.) The Courier's Program Director also testified that payment by the carrier to the substitute was made without the Newspaper's knowledge. (Reproduced Record at 119a.)

Unlike the majority, I would agree with Johnson that a reasonable interpretation of the facts in this case demonstrates his employee status. Accordingly, I respectfully dissent.

As the majority indicates, the single most persuasive indicator of a claimant's employee or independent contractor status lies in the control of the manner in which the work is accomplished. *North Penn Transfer, Inc. v. Workmen's Compensation Appeal Board,* 61 Pa.Commonwealth Ct. 469, 434 A.2d 228 (1981); *Davidson v. Workmen's Compensation Appeal Board (DeLeon),* 42 Pa.Commonwealth Ct. 30, 399 A.2d 1193 (1979). It is the existence of the *right* to control which is critical, even when that right is not exercised.[1] *Northern Central Bank and Trust Co. v. Workmen's Compensation Appeal Board (Kontz),* 88 Pa.Commonwealth Ct. 277, 489 A.2d 274 (1985). Thus, the key consideration here is whether Courier, having authorized Johnson to deliver its papers, had the right to control or supervise the manner and method by which Johnson completed those deliveries; I believe it did.

Courier claims that Johnson was an independent contractor because he made his deliveries according to his own schedule and in whatever manner he chose, entirely free of Courier's day to day supervision or control. I disagree with this assessment.[2] Although it is true that Courier exerted little

1. This distinction is of particular importance in two types of cases: (1) when a highly skilled or experienced workman appears to be doing his job without supervision or interference; or (2) when a person is performing a job that is so simple that no supervision or interference is required. Under an "exercise" test, both workers would appear to be uncontrolled; yet in each case, the employer may still have the ultimate right to dictate the method of performance if the occasion arose. Johnson contends that he falls into the second category, and I must agree. Under the facts presented, I believe it reasonable to infer that Courier retained the right to control a carrier's manner of delivery because Courier reserved the power to summarily discharge any carrier. Indeed, if Courier had desired to supervise every detail of the deliveries, a carrier's only alternatives would have been to comply, resign or face possible termination.

2. Although I recognize that various aspects of Johnson's work do not support an employer/employee relationship, I do not feel that there exists the convincing accumulation of factors needed to signify Johnson's independent contractor status. Rather, I consider other elements,

daily supervision over Johnson, I believe that this was due to lack of need rather than lack of capacity. Moreover, despite the absence of direct contact between Courier and Johnson, Courier actually exercised considerable control over Johnson's work performance.

Indeed, the facts include many persuasive factors favoring Johnson's employee status. First, it is noteworthy that Courier's method of payment indicated Johnson's continuing service, suggestive of an employer/employee relationship. Courier did not pay its carriers at intervals governed by job completion; rather, carriers were paid at regular time intervals, receiving a check every two weeks at the rate of $.05 per day for each paper delivered. Moreover, Courier billed their subscribers, who then paid Courier directly at a price fixed by Courier; the carriers were not involved in the financial dealings in any way and never handled any customer money.

Also indicative of an employment relationship is the fact that Courier specifically requested subscribers to contact the newspaper with any problems regarding delivery service. Courier would communicate any complaints to the carrier and advise carriers about any specific delivery instructions. Quite significantly, Courier offered a bonus of $1.00 every two weeks if a carrier provided good service to route customers and fined the carrier $.50 each time a subscriber failed to receive a newspaper, an amount ten times that paid to deliver the same paper. Thus, Courier demonstrated a marked interest in the details of the carrier's industriousness, exerting control over a carrier's performance in a manner which was reflected dramatically in the carrier's compensation.

In addition, although Courier claimed that it did not fix Johnson's working hours, I note that Johnson was expected to complete his route, delivering approximately 50 papers, within a very limited period of time. Courier brought the newspapers to the drop-off point at 2:45 p.m. each day, and Johnson picked up the papers after the school day ended at 3:00 p.m. Carriers were expected to have all their papers delivered by

going to the core of the employee/independent contractor determination, more compelling.

6:00 p.m.; failure to satisfy this time requirement could result in dismissal. Thus, although Johnson could control the sequence of his deliveries within the required time frame, this was not a crucial indication of his independence. Because Courier delineated the route, supplied the names and locations of customers to the carriers and limited the amount of time in which they could make delivery, it is apparent that carriers would select the most efficient delivery sequence, a decision which hardly required individual thinking or special skill.[3]

I also believe that Courier's failure to supply its carriers with uniforms or equipment does not work to Johnson's disadvantage. None of Courier's employees wore uniforms; in fact, by providing carriers with a route, newspapers, and a bag to carry those papers, Courier provided all the tools required for the job.

Courier makes much of the fact that Johnson could arrange for a substitute to make his deliveries without receiving prior approval from Courier or even informing Courier of the substitution. Again, however, this "freedom" is illusory because it did not reduce Courier's control over Johnson. No matter who was actually making the deliveries, Courier retained the ability to penalize Johnson for poor performance. Certainly, the $.50 per paper fine was adequate incentive to ensure that a carrier selected a responsible replacement. Indeed, because the need for such replacements were sporadic and often last minute, this arrangement was, in effect, the most practical way for Courier to retain control over its carriers. By contrast, when Johnson took over his sister's route on a permanent basis, both he and his sister went to the newspaper's office where a Courier employee interviewed Johnson and officially turned the route over to him, providing instruction regarding the duties and responsibilities expected of him.

---

3. In *Hammermill,* the court stated that if a claimant is left with little or no choice in the selection of the methods to be used to reach the result desired, he would not be an independent contractor but a mere servant or agent. That is precisely the situation here.

Finally, I note that Courier had the freedom to terminate carriers without incurring liability for breach of contract. At the hearing before the referee, Jeff Gavazzi, Courier's Promotions Director, testified:

Q. Now, the—if you decided that a carrier was unsatisfactory, are you aware of any restrictions on telling them—on discharging them?

A. Uh, I can't think of any restrictions; we're very fair with that situation though.

Q. I'm not questioning your benevolence; what I'm saying is, I'm questioning your power. Did you have the power to tell any one of these carriers to go down the road, that you weren't satisfied with them for some reason or another?

A. Yes.

Q. Okay. You had—you had no contractual—you had no written contract with them that said that. . . .

A. No.

(R.R. at 138a.)

I acknowledge that this case is fact specific, with my conclusion hinging largely upon the control Courier exerted on carriers through its time restraints and its policy of performance-based reward and punishment. However, I also obtained guidance from other cases dealing with this issue. In *Balinski et ux. v. Press Publishing Co. et al.,* 118 Pa.Superior Ct. 89, 179 A. 897 (1935), the claimant was a newsboy who purchased newspapers from the Pittsburgh Press District manager, which the claimant then resold to the public at large through his own energies and by his own methods, at a profit to himself. The court determined that under these circumstances, the newsboy was not an employee but an independent vendor.

The *Balinski* "newsboy" was later analogized to a claimant who worked as a distributor for the P–G Publishing Company's daily newspapers in *Rodgers v. P–G Publishing Co.,* 194 Pa.Superior Ct. 207, 166 A.2d 544 (1960). As in *Balinski,* the distributor in *Rodgers* purchased the newspapers; he could then determine what to charge for them on resale. Each day,

after collecting the money from sales made, he turned over to the publishing company only the wholesale price of the papers he purchased, keeping the profits for himself. The court concluded that the distributor in *Rodgers* was an independent contractor, recognizing that in both *Balinski* and *Rodgers*, the claimants' return or profit was variable, depending upon their own initiative and industry.

Unlike the distributor in *Rodgers*, Johnson can be distinguished easily from the "newsboy" in *Balinski*. Johnson does not purchase papers from Courier for resale, with entitlement to any profits. Instead, he receives a specific number of papers from Courier with instructions to deliver them to particular customers, customers who pay Courier directly for this service.

By comparison, Johnson's situation more closely resembles that of the claimants in *Stevens* and *Shields v. William Freihofer Baking Co.*, 147 Pa.Superior Ct. 455, 24 A.2d 54 (1942), both of which were distinguished by the court in *Rodgers*. In *Stevens*, the claimant worked selling magazines for Publishers Agency. In that case, the claimant did not purchase the magazines from the company, he had no control over the selling price, and the employer instructed him as to the streets where he was to work. The court determined that because the company retained the factors of control as to time, territory and manner of sales, the claimant was an employee rather than an independent contractor.

In *Shields*, the claimant was a distributor for a baking company. He did not purchase the baked goods which he delivered; rather, the company delivered its product to him and he was to sell and deliver the merchandise in his own truck along a particular route. At the end of each day, he turned in all the money received from the day's cash sales, and once a week, he received a check from the company representing 20% of his weekly gross sales. On his route was one "authorized" charge account customer who, much like Courier's subscribers, paid the company directly, although the claimant delivered the products to that customer and received

a commission on those sales. With regard to this account, the court stated:

The "authorized" charge account throws considerable light on the question before us. It indicates quite clearly that the claimant was not selling that customer, at least, on his own account, entirely independent of the defendant company, but was acting for and on its behalf.

*Shields,* 147 Pa.Superior Ct. at 458, 24 A.2d at 56.

In *Kontz,* we confirmed that lack of daily supervision does not necessarily imply independent contractor status where the job does not require such supervision. In that case, we affirmed an employer-employee relationship in a situation where the claimant occasionally directed traffic in a bank's parking lot on his day off from his regular employment. Although the bank exerted little or no control over the manner in which the claimant directed traffic and provided no job instruction or equipment, we concluded that claimant was a bank employee because, in fact, there was little need for actual control and supervision, and the bank exerted all the control necessary, given the fact that the job was simple and no special equipment was required.

Here too, Courier exerts all the control necessary for the type of job performed by Johnson. Johnson had no newspapers of his own; rather, he was told which customers should receive a newspaper and was given only enough papers to cover that number. If he did not deliver a paper, or delivered it in a condition or manner which did not please the customer, customers complained directly to the circulation office of the Courier, which was then free to reprimand the carrier or terminate him. Thus, Courier retained control over all essential aspects of Johnson's work: time, territory and manner of performance.

The applicable principles for determining whether a claimant is an independent contractor or an employee are recognized by both Courier and Johnson; the difficulty arises in determining their applicability to the facts in this particular case. Admittedly, the case is close enough to give rise to

honest differences; however, after a careful review of the record here, I find myself in disagreement with the conclusion reached by the referee, and affirmed by the WCAB and this court's majority, that Johnson did not satisfy the burden imposed upon him. Instead, I believe that Courier had the right to control the manner of Johnson's work performance, the key consideration in establishing an employer/employee relationship. Accordingly, I would conclude that the WCAB erred in determining that Johnson was an independent contractor and would reverse its dismissal of Johnson's claim petition.

DOYLE and McGINLEY, JJ., join in this dissent.