# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| Beavex, Inc., | : | |
| Petitioner | : | |
| | : | |
| v. | : | No. 724 C.D. 2019 |
| | : | SUBMITTED: November 1, 2019 |
| Workers' Compensation Appeal | : | |
| Board (Ramirez), | : | |
| Respondent | : | |

BEFORE:    HONORABLE RENÉE COHN JUBELIRER, Judge
HONORABLE PATRICIA A. McCULLOUGH, Judge
HONORABLE ELLEN CEISLER, Judge

OPINION NOT REPORTED

MEMORANDUM OPINION
BY JUDGE CEISLER                                                    FILED: April 15, 2020

Beavex, Inc. (Beavex)[1] petitions this Court for review of the June 12, 2019, order of the Workers' Compensation Appeal Board (Board), which affirmed the decision of a workers' compensation judge (WCJ). The WCJ, constrained by the Board's determination in a previous interlocutory appeal that an employer-employee relationship existed, granted Hugo Ramirez (Claimant) benefits pursuant to the Workers' Compensation Act (Act).[2] Beavex argues on appeal that Claimant is an independent contractor ineligible for benefits under the Act and that the WCJ's finding to the contrary is not supported by substantial evidence. After careful review, we reverse the Board.

_____

[1] Employer provides courier services to various clients throughout the United States. Reproduced Record (R.R.) at 135a.

[2] Act of June 2, 1915, P.L. 736, *as amended*, 77 P.S. §§ 1-1041.4, 2501-2710.

## I. Background

### a. Pertinent Facts

On March 11, 2016, Claimant filed a claim petition against Beavex alleging a disabling injury to his right knee sustained in an August 1, 2013 motor vehicle accident (2013 MVA), while working in the course and scope of his employment. R.R. at 5a, 45a; Notes of Testimony (N.T.), 12/12/17, at 5. Beavex generally denied liability for Claimant's injury. R.R. at 9a-12a. Following assignment of the claim to a WCJ, the case was bifurcated to determine the threshold issue of Claimant's employment status.[3] R.R. at 19a. Claimant's status as an employee or independent contractor is the only issue before this Court.

Claimant testified he regularly drove three separate routes for Beavex. R.R. at 38a. Two routes involved retrieving empty bags from Beavex's office for delivery to nearby banks, where they were filled and then returned to Beavex.[4] *Id.* at 38a-39a. On his third route, Claimant picked up medical specimens from several hospitals and delivered them to the airport for transport to the Mayo Clinic. *Id.* at 41a. Security clearance from the federal Transportation Security Administration (TSA) was a prerequisite for Claimant's third route. *Id.* at 43a.

Claimant carried an identification (ID) badge issued by Beavex. *Id.* at 39a. The ID badge was also required to enter Beavex's building. *Id.* at 55a. Beavex mandated that Claimant purchase a uniform shirt with Beavex's logo to be worn at all times while completing his routes. *Id.* at 73a. Claimant received no training for

---

[3] An independent contractor is not entitled to benefits under the Act due to the absence of a master/servant relationship. Section 104 of the Act, 77 P.S. § 22; *Universal Am-Can, Ltd. v. Workers' Comp. Appeal Bd. (Minteer)*, 762 A.2d 328, 330 (Pa. 2000).

[4] Claimant testified he did not know what the full bags contained, as they were closed when he received them. N.T., 5/12/16, at 47.

his first two routes, as he previously held a similar job with Citizens Bank. *Id.* at 50a-51a. The hospital route, however, required Claimant first pass a qualifying test then receive specialized training, which Beavex provided at its office. *Id.* at 41a-42a, 51a-52a.

Beavex required Claimant acquire an occupational accident insurance policy with Zurich Insurance (Zurich). Beavex provided no benefits such as a pension or health care. *Id.* at 67a. Claimant owned the vehicle he used to make deliveries and was responsible for the cost of insurance, fuel, registration, and maintenance. *Id.* at 59a-61a.

Claimant's compensation was based on each route completed. *Id.* at 63a. Beavex would reimburse Claimant for the cost of tolls if Claimant agreed to make a delivery outside his regular routes. *Id.* at 62a. Beavex required Claimant provide 10 days' notice if he could not perform one of his regular routes. *Id.* at 65a. Claimant could substitute another driver to make his deliveries; however, that person had to be approved by Beavex and pass a background and drug test. *Id.* at 75a.

If Claimant had to deviate from the established delivery route for traffic, or if he was running late, he had to notify Beavex, which would then contact the customer. *Id.* at 38a, 66a. Claimant did not have the option of taking a break if he wished to, as his deliveries were very time sensitive. *Id.* at 66a. If one of Beavex's customers had an issue with Claimant's job performance, the customer contacted Beavex directly. *Id.* at 67a.

Claimant had no other employment during the period he worked for Beavex. *Id.* at 76a. He could not recall whether outside employment was permitted. *Id.* at 78a. However, Claimant executed an owner/operator agreement (Agreement) with

Beavex which indicated he was free to provide concurrent delivery services to other entities or engage in any other trade or occupation. *Id.* at 91a.

Under the terms of the Agreement, Beavex exercised no control over Claimant's deliveries or the method of their performance, including the selection of delivery routes; delivery services were subject to Claimant's independent judgment and discretion and the needs of Beavex's customers. *Id.* at 82a, 84a. Claimant agreed, however, to document his deliveries by means of a manifest, in which Claimant would reconcile the number of items tendered at a given location with those left at the delivery point. *Id.* at 94a-95a. Furthermore, Claimant could not transport any individual in his vehicle unless that person was otherwise eligible to provide services for Beavex's customers. *Id.* at 85a.

Claimant agreed to provide all equipment required to perform delivery services and to bear responsibility for all operational and maintenance costs of such equipment. *Id.* at 83a. Claimant agreed to obtain vehicle and cargo insurance, as well as occupational accident insurance. *Id.* at 87a-88a. Claimant bore the responsibility of providing workers' compensation or unemployment insurance for his employees, if any. *Id.* Claimant also agreed to abide by any specialized requirements of Beavex's customers, including submission to drug testing, and to bear the cost of compliance with such requirements. *Id.* at 83a. Claimant agreed to indemnify Beavex for any claims in connection with Claimant's delivery services. *Id.* at 90a.

Claimant executed an "Affidavit of Independent Contractor Status," affirming he operated as an independent contractor and had the freedom to advertise delivery services to the general public, including Beavex's competitors. *Id.* at 99a. Claimant acknowledged he signed the Affidavit. *Id.* at 58a.

4

In executing the policy with Zurich, Claimant certified he was an independent contractor, not an employee, and he would receive a 1099 form, rather than a W-2 form. *Id.* at 103a. Claimant acknowledged he understood that coverage with Zurich was conditioned on his status as an independent contractor, not an employee, and coverage would be canceled if Claimant was an employee. *Id.* Subsequent to the 2013 MVA, Claimant filed a claim against his Zurich insurance policy for the injuries he sustained. *Id.* at 71a. He received wage benefits in the amount of $222.96 per week, as well as coverage for medical expenses. *Id.* at 72a.

Angie Wheeler, Beavex's Independent Contractor Services Manager (Wheeler), testified that Beavex's delivery services were exclusively performed by independent contractors. *Id.* at 141a. Beavex screened prospective independent contractors to ensure they carried any necessary licenses and insurance and otherwise complied with the customer's security requirements. *Id.* at 137a. The bank bags collected by Claimant belonged to Beavex's banking customers, not Beavex. *Id.* at 145a. Delivery schedules, and any associated time constraints, were imposed by Beavex's customers and the driving route was left to the discretion of the driver. *Id.* at 149a-50a. Any requirement that Claimant carry a Beavex-issued ID badge and wear Beavex's uniform shirt was customer-driven. *Id.* at 148a.

### b. First WCJ Decision

In a decision circulated November 3, 2016 (First WCJ Decision), the WCJ found that the credible evidence of record established Claimant was an independent contractor and not an employee at the time of his August 1, 2013 accident. Certified Record (C.R.), Item No. 5, Finding of Fact (F.F.) No. 7. The WCJ deemed Claimant's testimony credible to the extent it was consistent with the terms of the Agreement and the testimony of Wheeler. F.F. No. 5. The WCJ found Wheeler

5

credible and persuasive, as she had personal knowledge of the Agreement's terms and of the contracting process between Beavex and its independent contractors, and her testimony was consistent with the terms of the Agreement, the other documentary evidence of record, and Claimant's testimony. F.F. No. 6.

The WCJ relied on the following evidence in making her findings:

1. Claimant signed the Agreement expressly indicating his status as an independent contractor;

2. Claimant contracted his own routes and had control over the specific routes chosen to reach his destinations;

3. Claimant used his own personal vehicle, for which he was responsible to pay the costs of maintenance, insurance, and gas;

4. Claimant could refuse any additional assignments beyond those for which he was contracted and he was permitted to work for other entities besides Beavex;

5. Claimant could subcontract his services to other individuals;

6. Claimant paid his own taxes, received a 1099 form from Beavex, and described himself as a sole proprietor on his tax documents;

7. Any requirements that Claimant obtain security clearances, wear Beavex's ID badge and uniform, and receive specialized training came from Beavex's customers, not Beavex;

8. Beavex's customers dictated delivery times, schedules, and Claimant's conduct when performing delivery services;

9. Claimant was paid per route completed and Beavex provided no sick or vacation leave, or other fringe benefits;

10. There was no evidence that Beavex supervised Claimant in any way or controlled his day-to-day activities;

11. Beavex did not provide Claimant with any of the tools, supplies, or equipment required for Claimant to perform his job.

F.F. No. 7.

As Claimant failed to establish he was an employee of Beavex, and the evidence demonstrated he was an independent contractor, Claimant's petition for benefits under the Act was denied. First WCJ Decision, Conclusions of Law (COL) Nos. 2-3. Claimant appealed to the Board, arguing Beavex exercised sufficient control over Claimant's work that he was an employee, not an independent contractor. C.R., Item No. 6.

### c. First Board Decision

In a decision rendered August 24, 2017 (First Board Opinion), the Board agreed with Claimant, reversed the WCJ, and remanded the matter for a determination on the merits of Claimant's claim petition. Citing this Court's decision in *B & T Trucking v. Workers' Compensation Appeal Board (Paull)*, 815 A.2d 1167, 1171 (Pa. Cmwlth. 2003), the Board noted four elements should be analyzed in determining the existence of an employment relationship: 1) the right to select the employee; 2) the right and power to remove the employee; 3) the power to direct the manner of performance of the employee's duties; and 4) the potential power to control the employee.[5] C.R., Item No. 8 at 11. Having reviewed the record,

_____

[5] The claimant in *B & T Trucking* was a one-third owner of the employer and the WCJ denied him workers' compensation benefits on the basis of this ownership status. 815 A.2d at 1170. The Board reversed, concluding that the claimant's status as a part owner did not preclude a finding that he was also an employee. *Id.* In reviewing the Board's decision, this Court cited four factors to be analyzed when determining the existence of an employer-employee relationship: (1) the right to select the employee; (2) the right and power to remove the employee; (3) the power to direct the manner of performance; and (4) the potential power to control the employee. *Id.* at 1171. An analysis of these factors was not possible based on a review of the available record, as it was not clear who directed the claimant's performance of his job, to whom he had to report, who

7

the Board concluded Beavex had the right to select drivers and the right and power to remove them. *Id.* Furthermore, the requirements of Beavex's customers, including security clearances and the use of Beavex's ID badge and uniform shirt, were those of a third party not bound by the Agreement between Claimant and Beavex. *Id.* Claimant communicated with Beavex if he was behind schedule, not the customer, and customers called Beavex if they had issues with Claimant's services. *Id.* Beavex had the right to terminate the Agreement for unsatisfactory performance. *Id.* at 11-12. Such evidence demonstrated that Beavex imposed a high level of control upon Claimant's day-to-day activities to satisfy the requirements of its customers. *Id.* at 12. Given Beavex's right to terminate the Agreement at any time, Claimant established the existence of an employment relationship. *Id.*

### d. Second WCJ Decision

On remand, and after reviewing medical evidence,[6] the WCJ circulated a second decision on December 14, 2018 (Second WCJ Decision). C.R., Item No. 10. The WCJ noted she was "constrained" by the Board's remand order to find that Claimant was an employee of Beavex at the time of the 2013 MVA. *Id.*, F.F. No. 11(a). Further, the credible and unrebutted evidence demonstrated Claimant was performing work duties at the time of the 2013 MVA. *Id.* Accordingly, the WCJ awarded workers' compensation benefits to Claimant.

Beavex appealed to the Board, which affirmed the WCJ on June 12, 2019. C.R., Item No. 13. The Board declined to revisit the existence of an employer-

---

set his salary and schedule, and whether he was covered by the employer's workers' compensation insurance. *Id.* at 1173. Accordingly, this Court vacated the Board's order and remanded the matter for further proceedings. *Id.*

[6] As the sole issue before this Court is whether Claimant established the existence of an employer-employee relationship, we need not summarize the medical testimony, or the WCJ's credibility determinations made thereupon.

employee relationship and reaffirmed as final its August 24, 2017 determination that Claimant was Beavex's employee. *Id.* at 4.

## II. Issues

On appeal to this Court,[7] Beavex argues the Board erred in concluding Claimant was an employee and not an independent contractor.[8] As such, Beavex argues the Board erred in affirming the WCJ's grant of benefits under the Act.

## III. Analysis

In a claim petition, the burden of establishing a right to workers' compensation benefits and proving all necessary elements to support such an award rests with the claimant. *Coyne v. Workers' Comp. Appeal Bd. (Villanova Univ. and PMA Grp.)*, 942 A.2d 939, 945 (Pa. Cmwlth. 2008). The claimant must establish that his injury was sustained during the course and scope of employment and is causally related to that employment. *Id.*

An independent contractor is not entitled to benefits because of the absence of a master/servant relationship. Section 104 of the Act, 77 P.S. § 22; *Universal Am-Can*, 762 A.2d at 330. Employee or independent contractor status is a crucial threshold determination that must be made before workers' compensation benefits may be awarded and the claimant bears the burden of establishing the existence of an employer-employee relationship. *Universal Am-Can*, 762 A.2d at 330. Such a determination is a question of law governed by the facts of each case. *Id.* at 330-31. As a determination regarding the existence of an employer-employee relationship is

---

[7] Our review is limited to determining whether constitutional rights have been violated, an error of law has been committed, and whether necessary findings of fact are supported by substantial evidence. *Universal Am-Can*, 762 A.2d at 331 n.2.

[8] Employer raises four separate issues; however, those issues are subsumed into the overriding question of whether Claimant established the existence of an employer-employee relationship.

9

a question of law, our scope of review is plenary and our standard of review is *de novo*. *Dep't of Labor and Indus. v. Workers' Comp. Appeal Bd. (Lin & E. Taste)*, 155 A.3d 103, 109 (Pa. Cmwlth. 2017).

While no hard and fast rule exists for determining whether a relationship is that of employer-employee or owner-independent contractor, our Supreme Court has established certain factors which must be taken into consideration:

> Control of manner work is to be done; responsibility for result only; terms of agreement between the parties; the nature of the work or occupation; skill required for performance; whether one employed is engaged in a distinct occupation or business; which party supplies the tools; whether payment is by the time or by the job; whether work is part of the regular business of the employer, and also the right to terminate the employment at any time.

*Hammermill Paper Co. v. Rust Eng'g Co.*, 243 A.2d 389, 392 (Pa. 1968), quoting *Stepp v. Renn*, 135 A.2d 794, 796 (Pa. Super. 1957).[9] Although no single factor is

---

[9] The controversy in *Hammermill* involved the construction, and subsequent collapse, of a brick curtain wall erected by Rust Engineering Company (Rust) at a plant owned by Hammermill Paper Company (Hammermill). 243 A.2d at 391. Hammermill's insurance carrier instituted an action against Rust to recover funds it paid Hammermill for losses associated with the wall's collapse. *Id.* The trial court granted Rust's motion for judgment on the pleadings on the basis that Rust was an "employee agency" under the direct control of Hammermill, and Hammermill alone was at fault, having retained control and responsibility for the construction of the wall. *Id.* The Supreme Court disagreed, as the contract between Rust and Hammermill placed no responsibility on the part of Hammermill with regard to the designs and specifications to be followed in constructing the wall. *Id.* at 391-92. In considering whether the relationship between Rust and Hammermill was that of employer-employee or owner-independent contractor, the Supreme Court reviewed the following factors:

> Control of manner work is to be done; responsibility for result only; terms of agreement between the parties; the nature of the work or occupation; skill required for performance; whether one employed

10

controlling, the right to control the manner in which the work is accomplished is the most persuasive indication of the presence or absence of an employer-employee relationship. *Nevin Trucking v. Workmen's Comp. Appeal Bd. (Murdock)*, 667 A.2d 262, 266 (Pa. Cmwlth. 1995). The right to control the work is significant, regardless of whether such control is actually exercised. *Universal Am-Can*, 762 A.2d at 333. Control exists where the alleged employer has the right to select the employee, the right and power to discharge the employee, the power to direct the manner of performance, and the power to control the employee. *Am. Road Lines v. Workers' Comp. Appeal Bd. (Royal)*, 39 A.3d 603, 611 (Pa. Cmwlth. 2012).

A tax filing that denotes self-employment is a relevant factor, but not dispositive on the issue. *Edwards v. Workers' Comp. Appeal Bd. (Epicure Home Care, Inc.)*, 134 A.3d 1156, 1163 (Pa. Cmwlth. 2016). The existence of an

---

is engaged in a distinct occupation or business; which party supplies the tools; whether payment is by the time or by the job; whether work is part of the regular business of the employer, and also the right to terminate the employment at any time.

*Id.* at 392.

Under the terms of the agreement between the parties, Hammermill engaged the services of Rust to accomplish a particular result – construction of a wall – and Hammermill's reservation of control over Rust's work was solely aimed at limiting the costs of the project. *Id.* at 392. To that end, Hammermill retained the right to add or subtract from the work performed and could reduce the scope of the job if costs were greater than anticipated. *Id.* Rust was a specialist with expertise in the business of industrial construction, whereas Hammermill was not an engineering or construction firm but rather a manufacturer of paper products. *Id.* Rust supplied all the tools, labor, and materials required to complete the work. *Id.* Rust controlled its own workers, the job site, and the manner in which the work was to be performed. *Id.* The Supreme Court did not find a measure of control on Hammermill's part that would prohibit Rust from exercising its judgment in construction matters. *Id.* at 393. The Supreme Court acknowledged that an employer-employee relationship might be established if and when testimony was taken; however, judgment on the pleadings was not appropriate given the terms of the contract. Accordingly, judgment of the trial court was reversed. *Id.* at 395.

11

independent contractor agreement is likewise a factor to consider, but not dispositive. *Id.* An agreement of the parties to a designation of their relationship that is contrary to the otherwise-established employer-employee relationship cannot act to effect a change in that regard. *Nevin Trucking*, 667 A.2d at 267. Inferences favoring an employment relationship need only be slightly stronger than those which oppose it. *Universal Am-Can*, 762 A.2d at 330.

Beavex argues that the WCJ's initial determination that Claimant was an independent contractor was supported by substantial evidence. Beavex points out that the Board took no new evidence and was therefore required to affirm the WCJ if her findings were supported by substantial evidence.[10] Consequently, Beavex contends the Board overstepped the limits of its appellate review by engaging in fact finding and making new credibility determinations when it reversed the WCJ. By way of example, Beavex notes that the WCJ found there was no evidence that Beavex supervised Claimant or controlled his day-to-day activities. First WCJ Decision, F.F. No. 7. The Board never determined that this finding of fact was unsupported by substantial evidence but nevertheless opined that Beavex imposed a high level of control over Claimant's day-to-day activities to satisfy the requirements of Beavex's customers. First Bd. Op. at 12. In so doing, Beavex argues, the Board "commandeered" the WCJ's duties as factfinder. Beavex Br. at 40.

Beavex also contends the WCJ was not required to follow the Board's determination that an employer-employee relationship existed. Beavex maintains that the WCJ should instead have made new findings with regard to Claimant's

---

[10] Employer cites *Department of Labor and Industry v. Workers' Compensation Appeal Board (Lin and Eastern Taste)* 155 A.3d 103, 107 (Pa. Cmwlth. 2017) (it is irrelevant whether the record contains evidence to support findings other than those made by the WCJ so long as evidence exists to support the findings actually made).

employment relationship. Beavex asserts the WCJ's statement that she was constrained by the Board's August 24, 2017 conclusion did not meet the reasoned decision provision of the Act[11] and the Board should have reversed her decision on that basis. Essentially, Beavex argues the WCJ had authority to revisit the issue of Claimant's employment status and she could exceed the Board's order on remand by finding Claimant was an independent contractor.[12]

Beavex's arguments regarding Claimant's employment status largely rely on our Supreme Court's decision in *Universal Am-Can* and this Court's holding in *Johnson v. Workmen's Compensation Appeal Board (Dubois Courier Express)*, 631 A.2d 693 (Pa. Cmwlth. 1993). We agree that these decisions support a conclusion that Claimant was an independent contractor.

In *Universal Am-Can*, the claimant was the owner-operator of a tractor-trailer unit leased to a motor carrier. 762 A.2d at 329. Following an injury sustained while in the course of his duties, the owner-operator filed a claim petition seeking benefits

---

[11] Section 422(a) of the Act provides, in pertinent part, that "[a]ll parties to an adjudicatory proceeding are entitled to a reasoned decision containing findings of fact and conclusions of law based upon the evidence as a whole which clearly and concisely states and explains the rationale for the decisions so that all can determine why and how a particular result was reached." 77 P.S. § 834.

[12] Employer's argument that the WCJ, following remand, could reject the Board's determination that Claimant was an employee and make contrary findings is not supported by the precedent of this Court. A WCJ should restrict remand proceedings to the purpose indicated by the remand order. *Del. Cty. v. Workers' Comp. Appeal Bd. (Baxter-Coles)*, 808 A.2d 965, 968 (Pa. Cmwlth. 2002). While the WCJ was not precluded from taking additional evidence on remand, such evidence should only address the issues contained in the Board's remand order. *Riley v. Workers' Comp. Appeal Bd. (Dep't of Pub. Welfare/Norristown State Hosp.)*, 997 A.2d 382, 389 (Pa. Cmwlth. 2010) (WCJ exceeded his scope of remand by receiving testimony and ruling on an issue not contained in the Board's remand order). Presently, the Board concluded Claimant established the existence of an employer-employee relationship. Consequently, the Board reversed the WCJ's order and remanded the matter for further proceedings. Nothing in the Board's order suggests the WCJ could revisit the issue of Claimant's employment status.

13

under the Act. *Id.* In granting the claim petition, the WCJ found that the motor carrier controlled the owner-operator's work to a significant degree. *Id.* at 330. The Board affirmed, as did this Court. *Id.* In concluding the motor carrier exercised control over the work performed by the owner-operator, thus establishing the existence of an employer-employee relationship, this Court placed emphasis on the motor carrier's mandate that the owner-operator comply with federal and state regulations. *Id.*

The Supreme Court reversed, noting that the applicable regulations reflected the exercise of control by the government, not the motor carrier. *Id.* at 336. Compliance with such regulations was merely a factor to be considered in an analysis of employee status. *Id.* at 332. The Supreme Court determined that the record otherwise failed to establish the motor carrier exercised any control over the work to be done by the owner-operator or over the manner in which it was to be performed. *Id.* at 336.

*Johnson* concerned a claim petition filed by a 13-year-old boy hit by a car while delivering newspapers. 631 A.2d at 694. In determining the claimant was an independent contractor, not an employee of the newspaper, the Referee[13] found the newspaper had no right to control the claimant's performance of his duties and exercised no control over the manner in which he performed those duties. *Id.* at 695. The newspaper supplied the bag used to carry papers and the claimant was assigned a specific delivery route which he was required to complete by 6:00 p.m. *Id.* at 694. The claimant's hours were not fixed beyond an instruction that papers be delivered

---

[13] WCJs were previously referred to as referees under the Act. *See* Section 401 of the Act, *amended by* the Act of July 2, 1993, P.L. 190, 77 P.S. § 701 (the term referee shall mean a WCJ and any reference to a workmen's compensation referee shall be deemed to be a reference to a WCJ).

by 6:00 p.m. *Id.* at 695. The claimant was free to choose his own route of travel and the manner in which he delivered papers, whether by foot, bicycle, or other vehicle. *Id.* at 694-95. Any special instruction on where to deliver the paper was provided by the individual customer and not the newspaper. *Id.* at 695. The newspaper imposed no uniform or dress code to follow while delivering papers and the claimant was paid for each paper delivered. *Id.* No taxes or other charges were withheld from the claimant's pay and he received no fringe benefits. *Id.* at 695. Customers paid the newspaper directly and the claimant handled no money. *Id.* at 694. Service issues, whether general or relating to the claimant's performance, were made by the customer to the newspaper directly. *Id.* at 695. The claimant could substitute another person to deliver papers without notice to, or approval by, the newspaper. *Id.*

The Board affirmed the Referee. This Court agreed with the Board, concluding the claimant's work was not controlled in such specific detail that his relationship with the newspaper could be considered anything other than a contract for service delivery. *Id.* at 697. In affirming, this Court focused on two factors relating to control – that the newspaper did not prohibit the claimant from delivering its competitors' papers at the same time and the claimant could substitute another person to deliver papers without notice or prior approval. *Id.* Ultimately, the newspaper was concerned only with the result of having its papers delivered, and not the manner in which delivery was accomplished. *Id.* at 698.

Beavex suggests adherence to its customers' security and business requirements may be likened to the federal and state regulations imposed on the claimant in *Universal Am-Can.* Any control imposed on Claimant's performance of his deliveries came from Beavex's customers, not from Beavex. Beavex asserts that

15

*Johnson* presents a similar factual scenario to the present dispute, particularly with regard to Claimant's ability to work for other entities and to subcontract his routes. We agree.

Given that our scope of review is plenary and our standard of review is *de novo*, whether Claimant is an independent contractor or an employee is a question of law fully reviewable by this Court, and we are not bound by the WCJ's or the Board's conclusions in that regard. *Johnson*, 631 A.2d 696. To determine whether Claimant established the existence of an employer-employee relationship, we apply the factors set forth in *Hammermill*, with emphasis on Beavex's right, if any, to control the manner by which Claimant performed delivery services.

As to the first *Hammermill* factor, control over the manner in which work is to be done, Beavex dictated to some extent how Claimant performed his job. Claimant could not transport in his vehicle any individual not also authorized to perform delivery services for Beavex. R.R. at 85a. Beavex required Claimant to obtain automobile, cargo, and occupational accident insurance. *Id.* at 87a. Claimant was required to wear an ID badge and uniform so that Beavex's customers could identify him as a person authorized to pick up and deliver packages. *Id.* at 84a. Claimant's receipt of compensation was conditioned upon submission of a driver's manifest, the format and contents of which were dictated by Beavex. *Id.* at 85a. Although Beavex did not provide training as such, it did provide "orientation as to the specific needs and requirements" of the customers Claimant would serve. *Id.* at 84a.

In general, however, Claimant was not subject to Beavex's control. Claimant supplied the vehicle used to make deliveries, and he was solely responsible for the costs associated with operating and maintaining that vehicle. *Id.* at 83a. Claimant

chose his own driving route, and his schedule was dictated by the customers, not by Beavex. *Id.* at 84a. Claimant maintained his own insurance coverage on his vehicle, as well as his own work injury insurance. *Id.* at 87a-88a. Claimant's receipt of benefits under the Zurich policy was conditioned upon his status as an independent contractor. *Id.* at 103a. Claimant was responsible for any loss incurred by Beavex through any defective service by Claimant to Beavex's customers. *Id.* at 90a. Claimant was paid by the job, and Beavex deducted no taxes from Claimant's compensation. *Id.* at 85a-86a. Claimant's tax and insurance documents, as well as the Agreement executed between Claimant and Beavex, declared Claimant's status as an independent contractor. *Id.* at 82a-104a. We therefore conclude the first factor – control over the manner in which work is to be done – weighs in favor of the WCJ's November 3, 2016 finding that Claimant was an independent contractor.

The second *Hammermill* factor looks to whether Beavex was concerned only with the result of the work, thus indicating Claimant was an independent contractor. This factor, to a certain degree, ties in with the first, as Claimant had clear restrictions and obligations imposed on the methods used to complete deliveries. However, the evidence indicates Beavex was primarily concerned with the end result that the property of its customers arrived at the correct destination. Claimant's use of a Beavex-issued ID badge and uniform shirt was ultimately a customer mandate which allowed the customer to immediately identify Claimant as an individual authorized to pick up and deliver its items. R.R. at 84a. Similarly, Beavex's requirement that Claimant document in a manifest the items tendered and delivered would help effectuate delivery of a customer's items.

With regard to the third *Hammermill* factor, the terms of agreement between the parties, the Agreement explicitly provided that Claimant was an independent

17

contractor. *Id.* at 82a. Claimant also signed an affidavit acknowledging independent contractor status. *Id.* at 99a. The Agreement further provided that Claimant was solely responsible for the payment of federal, state, and local taxes, and he agreed to submit to Beavex a W-9 form. *Id.* at 85a-86a. Any compensation received from Beavex would be reflected in 1099 form. *Id.* at 86a. Claimant was not covered by workers' compensation insurance or entitled to unemployment insurance. *Id.* at 87a-88a. In addition, Beavex's limited control over Claimant's work, discussed above concerning the first factor, was documented in the Agreement. Thus, the third factor also weighs in favor of a conclusion that Claimant was an independent contractor.

The fourth, fifth, and sixth factors used to determine whether an employer-employee relationship exists concern the nature of the work or occupation, the skill required for performance, and whether the person employed is engaged in a distinct occupation or business. As a delivery driver, Claimant had to acquire some additional training and TSA security clearance to deliver hospital specimens to the airport. *Id.* at 41a-43a, 51a-52a. However, there is no evidence to suggest any specialized skill was required to make these deliveries. Beavex's business is providing courier services for customers located throughout the United States. *Id.* at 135a. As one of Beavex's contracted delivery drivers, it cannot be said that Claimant was engaged in an occupation or business distinct from that of Beavex. These factors do not weigh strongly in favor of either employee or independent contractor status.

The seventh factor analyzes which party supplied the tools required for performance of the job at hand. Claimant unquestionably used his personal vehicle to make deliveries. *Id.* at 59a-60a. All other equipment, such as bank bags and medical specimens, were furnished by Beavex's customers. *Id.* at 41a, 145a.

18

Claimant's ID badge and uniform shirt were provided by Beavex, although Claimant was required to pay for the uniform shirt. *Id.* at 39a, 73a. We conclude this factor weighs in favor of the WCJ's November 3, 2016 finding that Claimant was an independent contractor.

The remaining factors concern whether payment is by time or by the job, whether the work is part of the regular business of the employer, and whether the employer has the right to terminate the employment at any time. There is no dispute Claimant was paid for each route completed. Claimant's work is clearly part of Beavex's regular business. As to Beavex's right to terminate the employment at any time, the Agreement granted Beavex the right to terminate the Agreement only upon a breach by Claimant. *Id.* at 91a-92a. Material breaches of the Agreement, resulting in immediate termination, included loss by Claimant of any customer property, failure to pay for any such loss, failure to maintain insurance required under the Agreement, and "failure to service entire route as agreed." *Id.* While Beavex's method of compensation favors a conclusion that Claimant was an independent contractor, the nature of Claimant's work and Beavex's right to terminate the Agreement favors a contrary determination that Claimant established an employer-employee relationship.

Viewing all of the above factors, disposition of the ultimate issue here rests on the level of control exercised by Beavex. We cannot agree with the Board that the record demonstrates such a high level of control upon Claimant's day-to-day activities that an employer-employee relationship has been established. Rather, Claimant's day-to-day tasks were largely controlled by Beavex's customers or by Claimant himself. Like the claimant in *Johnson*, Claimant was not told when to begin his route. Rather, he typically arrived at Beavex's office between 1:20 and

19

1:45 in the afternoon. *Id.* at 37a. Any time constraints imposed on Claimant's deliveries originated with the customer. *Id.* at 84a. Use of a Beavex-issued ID badge and uniform shirt enabled identification by Beavex's customers of those individuals permitted to make deliveries. *Id.* While Claimant's right to subcontract his routes was not wholly unfettered, substitution was only limited to those persons meeting the customer's security requirements. *Id.* A condition that Claimant contact Beavex should he encounter delivery delays does not evidence Claimant's inability to choose the specific route he travelled on a given day. Beavex's requirement that Claimant submit a manifest reconciling the number of items tendered with those delivered merely suggests Beavex controlled the method by which Claimant proved he successfully completed his routes. Simply put, the evidence supporting the existence of an employer-employee relationship is not stronger than that which opposes it. *Universal Am-Can.*

## IV. Conclusion

Beavex imposed some restrictions upon the method of Claimant's work performance. When making deliveries, Claimant wore a Beavex-issued ID badge and uniform top. Claimant documented his deliveries in a manifest and he could only substitute his services with a driver meeting the customer's service and security needs. Overall, however, the evidence establishes Beavex was primarily concerned with the result of Claimant's work – successful pickup and delivery of items on his routes. Having reviewed the record as a whole, we conclude it fails to establish that Beavex exercised such control over Claimant's work that it assumed responsibility for the manner in which Claimant performed that work. Therefore, Claimant has not demonstrated the existence of an employer-employee relationship, and we are

constrained to reverse the Board's June 12, 2019 order affirming the WCJ's award of benefits under the Act.

_____

ELLEN CEISLER, Judge

21

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Beavex, Inc.,                 :
          Petitioner        :
                       :
      v.                  :  No. 724 C.D. 2019
                       :
Workers' Compensation Appeal  :
Board (Ramirez),         :
          Respondent    :

# **O R D E R**

AND NOW, this 15th day of April, 2020, the June 12, 2019 order of Workers' Compensation Appeal Board is hereby REVERSED.

_____
ELLEN CEISLER, Judge